## NELLIE BYRNE, Appellant, v. FRANK B. FULKERSON et al.

**Division One, January 3, 1914.**

1. **WILL CONTEST: Undue Influence: Evidence.** Evidence in a contest of a will *held* not sufficient to take to the jury the question of undue influence alleged to have been exerted upon the testator by an attorney whom she made executor under the will and trustee for a beneficiary, there being no showing of any fiduciary relation and the attorney not having been even present when the will was drawn.

2. ——: ——: **Presumptions.** There must be evidence of undue influence or of facts and circumstances raising a presumption or justifying an inference thereof before significance can be attached to the fact that the person who it is alleged exerted the influence did not testify.

3. ——: **Testamentary Capacity.** To have mind and memory enough to make a will, a testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have the will made.

4. ——: ——: **Weakness from Age and Disease.** Not every weakness incident to age and disease incapacitates a man for making a will, but a lack of testamentary capacity is none the less fatal because it is the result of these things.

5. ———: ———: **Senile Dementia.** Senile dementia begins gradually, is progressive, and in its advanced stages the brain is well-nigh stripped of its functions. The difficulty for the courts, as regards testamentary capacity, lies in determining the point at which in its progress such dementia has so impaired the faculties that they fall below the mark of legal capacity.

6. ———: ———: ———: **Evidence.** *Held*, in a will contest, that there was substantial evidence of such senile dementia and delusions incident thereto as to make the question of testator's testamentary capacity one for the jury.

7. ———: ———: **Sanity: At Very Moment of Signing: Presumptions: Rebuttal: Proof.** As regards the issue of testamentary capacity in a will contest, it is undoubtedly true that the real question is as to the sanity of the testator at the time he signed the will, but it does not follow that the proof of testamentary incapacity at that very moment must be made by eyewitnesses. Proof of insanity permanent (and here progressive) in its nature raises a presumption of continuity which it is incumbent upon the proponents to rebut, and substantial evidence of mental unsoundness of that kind with the evidence of proponents to the contrary generally ought to be sent to the jury so that they may resolve the conflict.

8. ———: ———: **Management of Property: Evidence.** Where proponents in a will contest attempt to show competency by evidence that testatrix successfully managed her property until her death, evidence on the part of contestants that her management had been unsuccessful is admissible.

Appeal from Buchanan Circuit Court.—*Hon. L. J. Eastin*, Judge.

REVERSED AND REMANDED.

*William E. Sherwood, John D. McNeely* and *Charles H. Mayer* for appellant.

(1) Insanity is shown by proof of acts and conduct inconsistent with the character and previous habits of the party. McCurry v. Hooper, 12 Ala. 823. This court has said: "Testamentary incapacity may be shown to exist when the mind is so damaged by the ravages of disease and so dull and torpid as not to measure up to a common sense testamentary mark." Crum v. Crum, 132 S. W. 1070; Turner v. Anderson,

236 Mo. 544. In the case of Young v. Ridenbaugh, 67 Mo. 587, this court has said: "A child five years of age knows when it parts with its toys, that it is disposing of its property, and by the test given in the sixth instruction would be capable of making a will disposing of an estate worth $100,000 because it might know that it was disposing of its property." (2) A showing of insanity before and after the execution of the alleged will is a showing of insanity at the time of its execution. And especially is this true in the mental disease known as senile dementia. Beaver v. Spangler, 61 N. W. (Ia.) 1072; Giles v. Hodges, 43 N. W. 103; App. of Ulmer, 12 Atl. (Pa.) 686; Turner v. Anderson, 236 Mo. 544. Where the evidence shows the mental derangement was chronic it is a case for the jury. Turner v. Anderson, 236 Mo. 544. (3) The burden of proving undue influence is on the party alleging it; and like other questions of fraud and bad faith undue influence is a question of fact, and can rarely be proved by direct or positive evidence, but may be established by facts and circumstances, and upon grounds of public policy the doctrine of courts of equity has been adopted by courts of law as a guide in will contests. Dansman v. Rankin, 189 Mo. 677; Herster v. Herster, 11 Atl. 410. If party who prepares will takes in it the interests of guardian to residuary legatee he falls within the rule of suspicion—he must make a showing. Tompkins v. Tompkins, 19 Am. Dec. 659; McDaniel v. Crosby, 19 Ark. 533; App. of Cuthbert, 97 Pa. St. 163. This court has said: "When a devise or legacy (or substantial emoluments) has been given by testator to one occupying a fiduciary relation to him, proof of the existence of such a relation raises a presumption of undue influence, which will be fatal to the legacy, unless rebutted by proof of free deliberation and spontaneity on the part of the testator, and good faith on the part of the legatee." Dansman v. Rankin, 189 Mo. 677. Under the law and the

evidence a case of constructive fraud and undue influence arises in this case, and should have been rebutted by proponents. Dingman v. Romine, 141 Mo. 466; Libbe v. Kemp, 154 Mo. 580; Garver v. Williams, 44 Mo. 465; Rankin v. Patton, 65 Mo. 415. And the facts that the confidential adviser, trustee or guardian was not examined as a witness is a damaging circumstance against the proponents. Testimony of this nature is often of the greatest assistance in determining questions of sanity and the facts of its absence in a doubtful case has much adverse force. App. of Ullmer, 12 Atl. 686; Tompkins v. Tompkins, 19 Am. Dec. 659.

*Frederick D. Fulkerson, James W. Boyd, W. H. Utz* and *Carolus & Wilcox* for respondents.

(1)   If there is no substantial evidence of incompetency or undue influence, the case should not be submitted to the jury but the court should direct a verdict for the proponent. Sehr v. Lindemann, 153 Mo. 289; McFadin v. Catron, 138 Mo. 197; Von DeVeld v. Judy, 143 Mo. 348; Winn v. Greer, 217 Mo. 450. (2)   By competency is meant intelligence sufficient to understand the act he is performing, the property he possesses, the disposition he is making of it, and the persons, or objects, he makes the beneficiaries of his bounty. Winn v. Greer, 217 Mo. 446; Gibony v. Foster, 230 Mo. 131; Sehr v. Lindemann, 153 Mo. 288; Sayre v. Trustees, 192 Mo. 95; Crowson v. Crowson, 172 Mo. 691; Riggin v. College, 160 Mo. 579; Maddox v. Maddox, 114 Mo. 47; Hughes v. Rader, 183 Mo. 630; Southworth v. Southworth, 173 Mo. 59. The law indulges the presumption that the testator was possessed of a sound and disposing mind, and where the formal execution of a will according to the requirements of the statute is shown, as was done in the case at bar, and the subscribing witnesses testify to the

sanity of the testator, and he is of proper age to make a will, a prima-facie case in favor of the proponents of the will is made out, and the burden of proof rests upon the contestants to overcome this presumption by persuasive evidence. Riggin v. Westminster, 160 Mo. 579; Jackson v. Hardin, 83 Mo. 175; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283; Torts v. Wash, 175 Mo. 483. The fact of competency is to be decided by the state of testator's mind at the time the will was made. Winn v. Greer, 217 Mo. 450; Von DeVeld v. Judy, 143 Mo. 363; Cartwright v. Cartwright, 1 Phillim Rep. 90. It is not sufficient cause to set aside a will that the testator was of unsound mind but it must further appear that such unsoundness of mind was to such an extent as to render the testator at the very time of making the will incapable of knowing and understanding what property he owned, the disposition he desired to and did make of it, and the persons he makes beneficiaries of his bounty. Sayre v. Trustees, 192 Mo. 128; Crowson v. Crowson, 172 Mo. 691; Von DeVeld v. Judy, 143 Mo. 348; Winn v. Greer, 217 Mo. 450. The fact that medical experts of great learning testify in answer to hypothetical questions that a person was of unsound mind, does not make it incumbent upon the trial court to submit to the jury the question of the testator's testamentary capacity. Sayre v. Trustees, 192 Mo. 97; Winn v. Greer, 217 Mo. 453. A person may be mentally incapable of making a contract or managing his estate and yet be capable of making a will. Gibony v. Foster, 230 Mo. 134; Maddox v. Maddox, 114 Mo. 35; Von DeVeld v. Judy, 143 Mo. 369; Crowson v. Crowson, 172 Mo. 702. (3) By undue influence is meant such influence as amounts to force, coercion or overpersuasion which destroys the free agency and will power of the testator. Winn v. Greer, 217 Mo. 459; Sehr v. Lindemann, 153 Mo. 289; Hayes v. Hayes, 242 Mo. 155; Gibony v. Foster, 230 Mo. 106. The influence exerted up-

on the testatrix must not be such as would arise from respect or esteem but it must be the control of another will over that of the testatrix whose faculties have been so impaired as to submit to that control, so that she has ceased to be a free agent, and has quite succumbed to the power of the controlling will. Carl v. Gabel, 120 Mo. 283; Campbell v. Carlisle, 162 Mo. 643; Kischman v. Scott, 166 Mo. 214; Denning v. Butcher, 91 Iowa, 425. Affirmative proof of such undue influence is required to be made, either by direct facts shown, or facts and circumstances, from which undue influence results, as a reasonable and fair inference and not a mere conjecture. Sehr v. Lindemann, 153 Mo. 289; McFadin v. Catron, 138 Mo. 197.

BLAIR, C.—This is a proceeding to contest the will of Mary Habig. Under the pleadings the testamentary capacity of testatrix and her freedom from undue influence were in issue.

Will Contest.

On the evidence adduced the trial court directed a verdict for proponents and that ruling is, by this appeal, presented for review.

Mary Habig died in St. Joseph, Missouri, September 24, 1909, having executed the will in question on the fourth day of the previous month.

A previous will had been drafted for Mrs. Habig by respondent Fulkerson, and when she applied to him to write a second one he told her that since he was executor in the will he would rather not draft it for her and suggested that she get Senator L. A. Vories, another member of the St. Joseph Bar, to prepare the new will for her. At Mrs. Habig's request Fulkerson then sent Senator Vories to Mrs. Habig, telling him (Vories) that he (Fulkerson) would prefer not to be made executor of the will.

Senator Vories drew the will according to the directions given him by Mrs. Habig, retaining Fulkerson as executor. Mrs. Habig signed the will and it was

witnessed by Senator Vories and two others whose names Mrs. Habig suggested.

After first providing for the payment of her debts, testatrix by the will provided: That a suitable monument be erected at the grave of her sister, limiting the expense to $300; that the executor sell certain property, valued at about $3000, and pay over the proceeds to a nephew, William Miller; that the executor hold in trust for the son of contestant the sum of $3000, payable to him on his twenty-first birthday; that $300 be paid a grandnephew; that her household effects should go to contestant; that contestant and her family should occupy the home place as long as they desired, but that the executor should take charge of all the property and rent the realty and loan the money on real estate security to the best advantage, and after paying all taxes, expenses of administration and management and for repairs should pay over the balance to contestant so long as she lived, and then the *corpus* was devised to the heirs of contestant's body, share and share alike. This was followed by a clause the intent of which was to forfeit the rights of any legatee contesting the will and providing that if the present contestant instituted a contest the whole of the estate of which she was given the income should "descend to and become the property of the heirs of her body, payable to them on becoming of age." Defendant Fulkerson was made executor and given "full power to take charge of all of said property and dispose of same as herein provided."

The will was signed and witnessed August 4, 1909.

Contestant is the adopted daughter of testatrix, and in the deed of adoption duly executed by Mrs. Habig May 9, 1899, it was expressly provided that contestant should "have the same right . . . for support and maintenance and for proper and humane treatment and the same rights and none other of inheritance or taking under such will as I may make

that she would have had if she had been my own child.''

Since the question concerns the sufficiency of the evidence to warrant the submission of the case to the jury, it is necessary to state the evidence somewhat fully.

Proponents proved the formal execution, attestation and probate of the will, and according to the testimony of Senator Vories, who drafted the instrument, a former will was given him by Mr. Fulkerson, and he took this and called upon Mrs. Habig and she suggested the changes she desired. These changes were made and he again visited testatrix who suggested the names of witnesses who were called and the will signed and attested. Senator Vories testified the question as to the condition of testatrix's mind did not occur to him; he supposed ''she was an ordinary person transacting business, and that was all there was to it.'' He said Mrs. Habig gave as her reason for ''tying up the property for Mrs. Byrne that Mr. Byrne had frittered away property theretofore and she was afraid he would do it with this property.'' She said Mr. Byrne had sold the piano and had sold certain household goods she had given the family and had wasted the money.

Harry C. Carter, one of the witnesses to the will, testified that, judging from her conversation, Mrs. Habig's mind was quite clear the day she signed the will. He further testified she had formerly been neat and clean in her dress but he had noticed that of late years she wore clothing which was old and worn and somewhat soiled—in bad condition. To this witness also Mrs. Habig had said she was afraid her property would be dissipated. The other witness to the will first said in answer to the question whether Mrs. Habig was of sound mind at the time the will was signed, ''Oh, I couldn't tell. I never seen any difference in her from

any other time I saw her," but subsequently testified that he thought she was in her right mind at that time.

Mrs. Habig in earlier years had aided her husband in conducting his business, which was that of burning and buying and selling pottery. The evidence tends to show that during this time and for a while after her husband's death Mrs. Habig was neat and cleanly and a good housekeeper.

For contestant Mrs. Louisa Bansbach testified that she had known Mrs. Habig for about twenty years and knew her especially well during the last four years of her life; that in former years Mrs. Habig dressed well and was a good housekeeper but during the last four years of her life her clothing was frequently, or usually, filthy and ragged and she went out upon the streets in this condition. She neglected her person until she offended the nostrils of those about her and her house was dirty and ill kept; she worried constantly about her property, became very excitable and had frequent fits of temper, used a great deal of vulgar language and habitually "accused everybody of stealing" from her. Mrs. Habig seemed fond of her adopted daughter and the latter's husband and child, and on one occasion they moved back from Kansas City to St. Joseph intending to live next door to Mrs. Habig. She received them pleasantly and gave evidence she was glad they had come; "in a day or two after she was mad and wild and didn't want them— made it unpleasant;" used vulgar and offensive language to them and continued this at frequent intervals until they moved away.

John F. Tyler testified he had known Mrs. Habig for many years prior to her death and saw her on numerous occasions; as she grew older witness noticed she grew nervous; and in May, 1907, witness had, as agent for the owner, sold some property next that occupied by Mrs. Habig and met Mrs. Habig frequently for a month or six weeks; on one occasion she

"came to the door, eyes rather wide, hair disheveled, looked hardly like a human being, excited and" commenced talking about the property line. She was quite hard of hearing and would not listen to or respond to witness but kept constantly talking. Witness said Mrs. Habig was a peculiar woman and looked haggard and worn and distressed. He gave it as his opinion that during the last three years of her life Mrs. Habig was of unsound mind. Witness seldom saw Mrs. Habig after May, 1907, and was not sure he talked with her after that time.

Dr. Louis J. Dandurant, a practicing physician and a professor in Central Medical College of St. Joseph, and former assistant county physician of Buchanan county, had known Mrs. Habig for eight years prior to her death; he had seen her, he said, perhaps a hundred times, had talked with her a number of times and had treated her professionally. He gave it as his opinion that she was of unsound mind.

Mrs. Bettie Hickman testified that subsequent to May, 1907, she lived about a block and a half from Mrs. Habig until after the latter's death; that in going to and from work she passed Mrs. Habig's residence and the latter frequently asked her to do errands for her; that she frequently talked with her and sometimes went into the house at Mrs. Habig's request. Witness said Mrs. Habig's clothing was "very untidy, awful filthy and dirty" and her hair frequently unkempt; that Mrs. Habig would see her as she went to and from her work and would call her over and would curse and accuse people of stealing; that on one occasion Mrs. Habig asked her if she had heard that she (Mrs. Habig) had accused her nurse (Mrs. Taylor) of stealing the keys. Witness told her she had and that her information came from Mrs. Taylor's mother-in-law. Mrs. Habig accused witness of lying and threatened to kill her, saying she had a gun and invited witness in so she might show it to her. This was in the spring

or winter of 1909. This witness gave it as her opinion that Mrs. Habig was of unsound mind during the time she knew her.

Charles Freytag had known Mrs. Habig since 1893. When he first knew her she dressed neatly and her manner and conversation were pleasant. He did not see her for some years prior to June, 1909, when he moved his business to a building across the street from Mrs. Habig's residence. In the month mentioned she saw him upon the street and called him in; during the ensuing conversation she accused various persons of cheating her and then invited witness in to dinner, insisting on his accepting the invitation and asserting that dinner was ready; witness finally went in and found no preparations of any kind had been made for the meal. Mrs. Habig thereafter, for some weeks, frequently visited the store witness conducted; her clothing was very dirty and her face and hands had the appearance of not having been washed for some time; she continually, and day after day, accused various persons of cheating and robbing her and stealing from her; she would mistake witness' store for that of a Mr. Conroy which had been conducted across the street from her residence for a long time, and her conversation was disconnected. Her presence became so undesirable that witness would finally lock his door when he saw her coming. Witness was of the opinion that Mrs. Habig's mind was unsound.

Mrs. Bertha Taylor, a trained nurse, testified she was employed by Mrs. Habig from March 16 until about March 30, 1909. Mrs. Habig was quite sick when witness first went to stay with her and was delirious the first night or two; her clothing was wet with urine but she could not, at first, be induced to exchange it for a nightdress; she was very excitable. Contestant, Mrs. Byrne, came from her home in Kansas City at some time during witness' stay with Mrs. Habig and was kind and attentive to the latter though herself in

a very nervous condition; on one occasion, toward the end of the time mentioned, Mrs. Habig became very angry and cursed witness when witness handed her some keys she found in the bed. Mrs. Habig, though ill, would go to the kitchen in the basement when witness happened to leave her temporarily; witness saw her once after March 30th before she was recalled, September 4, 1909. After September 4th witness stayed with her at her house until she was removed to the hospital, September 10, 1909, and attended her there until her death. Mrs. Byrne and her husband and child came from Kansas City between September 4th and 10th and Mrs. Byrne remained in St. Joseph after Mrs. Habig was removed to the hospital; witness, on her return on September 4th found Mrs. Habig very weak, both physically and mentally. Witness gave it as her opinion that Mrs. Habig was of unsound mind.

Mrs. Lucinda Chambers worked for Mrs. Habig the first two weeks in August, 1909. Then her principal subject of conversation was her daughter (contestant) and grandson. On one occasion she sent witness for medicine with instructions to return at once and when she returned witness found the door locked and rang the bell, whereupon Mrs. Habig became angry and began cursing witness and applying epithets to her. Witness asked her if she wanted to take some of the medicine and she declared she wanted none of it. The next morning she asked for the medicine and took it. Mrs. Habig was notionate and high-tempered; if she began to talk "about anything she would fly off and get angry, talk different all at once and then cool down and talk nice."

Mrs. M. B. Chapman in the latter part of August, 1909, made what she termed "a church call" upon Mrs. Habig. She had not known her before. Mrs. Habig talked mainly about Mrs. Byrne (contestant) and her husband and child, praising them and going over the same subject "half a dozen times." She said she was

going to give "Nellie" (Mrs. Byrne) everything she had except three thousand dollars which she was going to give the child; she added that her husband before he died had settled that sum on the child; she told witness that the boy, then three years old, sang in the choir in a Kansas City church, and when witness suggested he was too young for that Mrs. Habig said that he sang in the choir "just the same;" she said Nellie had another child but she would look after him. Though Mrs. Habig had never seen witness before, she drew her chair up close to her and would take witness by the hand and hold it. While witness was there Mrs. Habig became ill.

Mr. A. P. Shull testified he knew Mrs. Habig for about ten years prior to her death; in her latter years she had grown negligent in her attire and the care of her house. In 1908 witness went to Mrs. Habig for information concerning the heirs of some one who had lived near her many years previously; Mrs. Habig's mind could not be kept on the subject; she would answer questions in part and then break off and commence talking about unrelated matters—her family and business matters and occurrences in the neighborhood; accuse her neighbors indiscriminately of stealing articles from the basement while she was upstairs. Witness saw Mrs. Habig twice in 1909. His opinion was that she was insane.

The Rev. U. G. Foote, pastor of the Francis Street Methodist Church in St. Joseph, of which Mrs. Habig seems to have been a member, called upon her several times. In April or May, 1909, he visited her home and as soon as witness entered the house Mrs. Habig began talking about her adopted daughter and the latter's husband and baby; witness tried to introduce other subjects but was unable to do so and "arose once or twice to leave but" Mrs. Habig, he says, "would catch me and make me sit down." She went over the same

thing again and again. Witness thought Mrs. Habig's mind was unsound.

Sylvester Grogg testified he became acquainted with Mrs. Habig in 1882 and lived in one of her houses for sixteen years preceding 1904, in which year he moved to a house about one block from where Mrs. Habig lived; that he saw her very frequently and talked with her as often as once a week until 1907; that he saw her often after that year but avoided her after that because of the monotonous triviality of her conversation. Witness said that during the last three years of her life Mrs. Habig's dress was slovenly and dirty, her shoes worn and frequently unbuttoned and her hair disheveled. In August, 1908, witness had a conversation with Mrs. Habig in which she suggested witness's niece and neighbors and friends were stealing from him. (There was no foundation for such suspicions.) Witness was of the opinion that Mrs. Habig's mind was unsound the last two years of her life.

Mr. McNeil, who conducted a laundry across the street from Mrs. Habig's residence, testified he had known Mrs. Habig nine years. He had noticed Mrs. Habig on the street and saw that her clothing was shabby and "not put on very good;" he talked with her a few times and saw her oftener and gave it as his opinion that during the last two years of her life she was of unsound mind.

Mr. W. B. Maxwell, a salesman in a drygoods store in St. Joseph, testified he had known Mrs. Habig possibly forty years; that in former years she was neat in her dress and kept her house well but in the last few years she became careless of her dress and appearance, became notionate, changed her mind so much about purchases she made that she "got to be a regular nuisance" with witness, and he was of the opinion that during the last two years of her life she was of unsound mind.

Simon Lechty testified he became acquainted with Mrs. Habig about ten years before her death; witness worked for Mrs. Habig at times until about 1906 and saw her and talked with her often after that until her last sickness; she was careless of her dress and of weather conditions, became very notionate and forgetful and constantly accused her neighbors of stealing from her. Witness was of the opinion her mind was unsound.

Herbert Bowe testified he saw Mrs. Habig once a week from December, 1908, to June; 1909; that she acted peculiarly and was usually poorly and frequently insufficiently clad; that he talked with her and from her conversation and actions he thought she was of unsound mind.

Dr. C. R. Woodson, a specialist in nervous and mental diseases, who conducted a sanitarium for the treatment of persons afflicted with such ailments and who had previously had charge of State Hospital for the Insane No. Two for seventeen years, testified he first became acquainted with Mrs. Habig about 1880. Until 1885 he frequently bought goods from her and her husband and she was then of good intellect, gave a good deal of attention to her husband's business, conducted herself properly and was as careful of her dress as was compatible with the duties she performed. After 1885 witness saw Mrs. Habig occasionally until about 1900, and then saw her no more until November or December, 1907. At that time she came to him and stated that her daughter (contestant) was in a sanitarium at Kansas City and that she was denied access to her and she wanted to get witness and three other physicians she named and some St. Joseph and Kansas City lawyers and go down and get her daughter out, stating she was unjustly detained and wanted to get out. Mrs. Habig wanted her daughter brought to witness's sanitarium. Witness says that after she had talked "in a disconnected way for an hour or two" he

got her to accept his suggestion that he telephone the husband, Mr. Byrne. This witness did and told Mr. Byrne, at Mrs. Habig's suggestion, that if he would bring his wife to witness's sanitarium she (Mrs. Habig) would pay the expenses. Mr. Byrne came to St. Joseph and the three talked the matter over at Mrs. Habig's residence; she wanted her daughter brought to St. Joseph and wanted witness to treat her and wanted the grandson brought to her house so she could care for him; she told Mr. Byrne to look the sanitarium over and said she would pay the bills. Mr. Byrne selected a room in the sanitarium and arranged that witness should send a nurse to Kansas City for Mrs. Byrne. That same evening Mrs. Habig told witness she was not going to send for her daughter; that she thought Byrne ought to support her. She had previously made four or five trips to witness's office to arrange for having her daughter brought to St. Joseph. Subsequently she attempted to reopen negotiations with witness to the same end and he refused to spend any further time that way. Witness observed that Mrs. Habig's clothing and person were not very clean, her conversation disconnected, her hair unkempt. He noticed a pronounced change in her mind, that it was very much enfeebled and unlike her former self. He testified that she was suffering from senile dementia, which he defined with particularity, and gave it as his opinion that the disease was progressive and that Mrs. Habig, from the time he saw her in 1907, would not recover but would grow worse. In answer to certain hypothetical questions predicating contestant's evidence and his own personal knowledge and, to an extent, assuming also the truth of some of proponent's evidence, he gave it as his opinion that on August 4, 1909, Mrs. Habig was insane.

Contestant testified that she was twenty-six years old and remembered her adopted mother from the time she was three or four years old. Contestant was mar-

ried in 1902 and lived in St. Joseph two years there-
after near her foster mother. Her husband worked in
the National Bank of St. Joseph. In 1904 the Byrnes
moved to Kansas City but visited Mrs. Habig five or
six times a year and she visited them at times in Kan-
sas City. Until 1905 Mrs. Habig was careful of her
dress and an immaculate housekeeper. About 1905 a
change in her in these respects began to make its ap-
pearance and she wore clothing that was shabby and
soiled, slept in her clothes and allowed her hair to go
uncombed. On occasions when her daughter with her
husband and child visited her she would assure them
she had everything ready for their entertainment but
it frequently developed she had made no preparations
at all, not even having procured anything to eat. On
one occasion she induced contestant and her husband
to return to St. Joseph to live with her and they sold
their furniture and came, but Mrs. Habig could not
make up her mind which rooms of the house she would
occupy; finally she seemed to reach a decision but when
contestant put up the baby's bed in one of the other
rooms Mrs. Habig grew very angry and used obscene
language to contestant and her husband to such an ex-
tent that they returned to Kansas City the next day.
Three months afterward while Mrs. Byrne was in a
sanitarium at Kansas City, Mrs. Habig visited her and
wanted to take her back to St. Joseph. Mrs. Habig
remained at the Byrne home until contestant returned
to it from the sanitarium and on the occasion of that
return she answered the doorbell but had some trouble
with the latch and became frightened and began to
scream. On occasions when contestant would visit her,
Mrs. Habig would exhibit affection sometimes for one
member of contestant's family and then another and
then would become angry and curse contestant. She
accused her neighbors of stealing from her and ac-
cused contestant likewise. Mrs. Habig sometimes used

cooking utensils and the kitchen sink as urinals. In 1908 contestant's child was sick and Mrs. Habig declared she hoped it would die. At times she urged contestant to give the baby to her husband and leave them and travel with her, saying she didn't want them. At other times she spoke affectionately of them. Her hearing was bad and she would frequently call contestant and her husband to come close to her, saying she wanted to tell them something and it often developed she had nothing to say to them or had forgotten it. She thought the neighbors were "listening through the wall" and would not talk in the room on that side of the house. She had bequeathed a chair to a Mr. Conroy in a will made a few weeks or months before the one in suit and she concluded she did not want Conroy to have the chair and a number of times tried to get contestant to take the chair and lock it in a closet.

Several letters by Mrs. Habig to contestant were put in evidence.

In the earlier ones of these are expressions of affection for contestant and her husband and child and some of them relate to edibles Mrs. Habig was sending contestant. They also contained passages concerning sales of property made by the writer, and one, in 1905, was filled with resentment toward persons who, testatrix wrote, had been, it seems, deriding contestant's husband and one was a rather humorous complaint about the character of the handwriting in a letter contestant had written.

At 4 p. m. July 1, 1905, Mrs. Habig (at St. Joseph) mailed contestant (at Kansas City) a *special delivery* letter as follows:

"'Nellie:

"I am in so much trobel I dont no what to do I my heart I wish I was Dead there is nothing but trobel for me I work like a dog a nigger Mr. Robinson is afful good to me they wont Let Allis in She has been

trying to get in ever Since the fire we ar afraid of Her burn this letter just as soon as read."

On February 16, 1908, Mrs. Habig wrote contestant as follows:

"Dear Nellie:

I Received your letter and was glad to hear from you and no that you ar getting better Nellie you Spoke of your under wear I have not Seen thoes nigers they charged 1 Dollar for what they wash without Ironing any of them and 50 ct for getting dinr on Sunday you no affter Picked the chicken it was not wroth that much So I did not give them anything More to do have you seen that Slut Since you got home that talked so bad about you Byrn Put her up to what She told I have herd him talk the Same thing you bet he talked about you and he cant get out of it for he talked St. Jo he told me many of thoes thing that Slut told hear now if he dont talk how did that Bull dog do thoes thing he (through up to me if Byrne the Bull Dog) hear if some of his talk to (me) he said you did not live in a house 2 weeks until he had to Move you to a Nother one how does the Byrne family no so much if he dont tell theas thing (how one thing More he Said you di not have a Gown when you went to the Sanetarem. why Beans he slep in your nise Gowns I Sent jus like he Slep in My Rappr . . . I am 63 years old but never heard of a man Sleep in a womans Gon Now the wooman that washed for you tells theas things. now I want to tell you one thing More the Last time he was hear he went in a Store you ought to hear how he Bragged tell how Much he was Making all I said in anse he has not Even a Bead to Lay on. Now one thing More while he was in the frunt Room Pilfering he took My Wast the Poor Sliper Elmon Twig Sleeping a Woomans Gownes I think he ought to go to No 2 and be treated, Nellie now you take good care of you Close and Let Byrne have Devors and I will Sell my furn and we will go a Broid & have a good

time while he is Brushin & cleaning before the Glass
Let him have the young Cockeral Just So we have a
good time.   George and Billie wear both hear you bet
when I told them what Byrne had done you bet they
was Mad I told them he Evan Sold the Bead and you
had to walk the Streat all Night.   Nellie I want you to
Stick to you Promes give thoes things to Senea and
She will Send them to me.''

(Separate piece of letter paper)   ''Nellie as the
Baby Put 2 of my Pear handel Nives in the Stove I
down Stars and I up Stars the on down Stars Burnt
Up Now I want you to Let me hav 2 of them I as I
blav the child is Crazy it is affl how he destroys thing
I think he takes it after you and Byrns of Nellie Let
Byrne & Baby go   Give the B to the Dood Nellie Stick
to your Promis Lotes of Love to you.   In the (word
not legible) the Bull dag wife is (word not legible)
find her & Byrne

''Mam.''

On February 20, 1908, she wrote:
''My one Dear Nellie

''I am all most wored to death over you I am so
fraid you ar Hungery I dream you did not have any
thing to Eat I Sent down to the Bank to Send you and
Baby 20 00 dollars and you will get it to day anser
at once Lotes of Love for you

''Mama

''I am not abel to get out I telephoned Enright
to Send you 20 00 no dont give this to Burns Keep it
for you and Baby I just got i Letter Since you went
I will Send you a chicke & Some Eggs Just as Soon
as it moderates So they wont freas ans at once I feel
so bad I can write.''

On July 16, 1908, she wrote again:
''Nellie

''You cant have that green Silk Pillow Top you
will have to Send it Back I have the Ribbon to make
it with and if you dont Send it to me I never will

Speak to you again you Must not think I am a Dogg now dont cut it up Send it to me Miss Louis gave it to me and I wont Let you have it answer and tell me when you are goying to Send it I gave you 25 30 I dont think you Treat me right I try to be good to you I bagh a Blew Silk drcs for you but you wont get it a Lon but I gave the Lone away.''

The piano which Mrs. Habig told the witnesses to her will Mr. Byrne had sold was still owned by contestant at the time of the trial, and there was evidence the Byrnes had not sold the furniture, the dissipation of the proceeds of sale of which and of the piano Mrs. Habig gave as her reason for giving contestant merely a life estate in her property.

On cross-examination of contestant's witnesses it appeared that Mrs. Habig down until her last sickness looked after the payment of her taxes, general and special, paid her bills at the stores and managed in large part the property her husband left her. These facts were evidently drawn out to show her capacity to manage her affairs, and the fact that her husband left much of the property encumbered and that Mrs. Habig, out of the rents and some sales, paid off some of these encumbrances was brought out.

Contestant then offered deeds executed by Mrs. Habig as evidence of the receipt by her of the considerations mentioned therein, and then offered the inventory of the estate for the declared purpose of showing bad management, asserting that the deeds disclosed that Mrs. Habig should have had on hand at her death many thousands of dollars not accounted for in the inventory. Both the deeds and the inventory were excluded.

At the time of her death, September 27, 1909, Mrs. Habig was sixty-nine years old.

Other facts necessary to a determination of the case will be stated in the course of the opinion.

Under the issues the verdict the trial court directed for proponents cannot stand if the record discloses there was substantial evidence tending to prove either that testatrix, on August 4, 1909, was mentally incapable of making a will or that the will was the product of undue influence exerted by defendant Fulkerson.

Contestant contends there was evidence sufficient to take both issues to the jury, and proponents insist there was no evidence, worthy the name, tending to prove either.

After a careful examination of the record we are unable to agree with either party.

I.   Defendant Fulkerson did not draft the will in suit.   He had drafted a previous will and this Mrs. Habig desired to change in some respects.   The new will was drafted by Senator Vories after two or three consultations with Mrs. Habig in which she explained the changes she wished made.   Fulkerson was present on none of these occasions; neither is there any evidence he had any connection with Vories save to suggest his name to Mrs. Habig after he, himself, declined to draft the will.   There is not a particle of evidence tending to show any collusion between Fulkerson and Vories or to indicate that either of them undertook to influence Mrs. Habig with respect to the changes she desired made.   On the contrary the evidence indicates that both these gentlemen comported themselves with entire propriety in the matter.

Undue Influence.

The authorities cited supporting the proposition that if one who prepares a will takes under it a guardianship of a residuary legatee, a presumption of the exertion by him of undue influence is raised thereby, need not be discussed since the facts of this record do not set this principle in motion.

It is urged, however, that defendant Fulkerson stood in a fiduciary relationship to Mrs. Habig and,

consequently, the fact the will constituted him the executor and trustee for contestant raises a presumption of undue influence which it was incumbent upon him to rebut. One of the essential facts to be proved in order to raise the presumption relied upon is the existence of a fiduciary relationship, as the cases cited by contestant's counsel clearly show. [Tibbe v. Kamp, 154 Mo. 1. c. 580, 581; Dingman v. Romine, 141 Mo. 1. c. 474, 475; Garvin's Admr. v. Williams, 44 Mo. 1. c. 470, 471.] In this case there is no substantial evidence of such a relationship. Fulkerson may once, in former years, have represented Mrs. Habig in connection with a dispute over the line of one of her lots but this was remote in time and his chief business with her previous to his drafting the first will grew out of his firm's representation of owners of tax bills against Mrs. Habig's property. In these matters he represented interests adverse to those of Mrs. Habig. The will in suit was drawn by Senator Vories, and there is not a hint in the evidence of any suggestion by anyone made to induce Mrs. Habig to conform this will to that Fulkerson had previously drawn nor of any effort to give direction, in any respect, to her wishes regarding the disposition of her property unless the suggestion Fulkerson made that he should not be retained as executor and trustee was so. Certainly that suggestion cannot aid contestant. Reliance is placed upon the case of Ranken v. Patton, 65 Mo. 378, 1. c. 414, 415, but that case simply holds that a deed which was the product of undue influence was not taken out of the general rule merely because he who secured the deed's execution caused a third and innocent person to be made grantee therein. The fact that Mrs. Habig, following her own suggestion to Senator Vories that she would do so, subsequently made out a check to Fulkerson for both his fee and that of Senator Vories is of slight consequence. Standing alone it is wholly

insufficient to indicate collusion or Vories' agency for Fulkerson (suggested by counsel) and the other evidence in the case affirmatively makes it clear enough no such relationship between Vories and Fulkerson existed. There was no substantial evidence of undue influence and the trial court was right in so holding.

This conclusion also disposes of the suggestion that Fulkerson's failure to testify was significant. Until there was evidence of the exertion by him of undue influence or evidence of facts and circumstances raising a presumption or justifying an inference thereof no case was made which called for a denial by him. His failure to testify when no evidence had been offered in any way impeaching his conduct cannot, of itself, make out a case for contestant on this issue, however weighty its probative force might have been had there been evidence of the existence of the fiduciary relationship.

**Presumptions.**

II. With respect to the test to be applied in determining testamentary capacity this court recently said: "To have mind and memory enough to make a will, testator should be able at the time to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him power to dispose of his property by will. A mind not coming up to that standard is not a testamentary one. [Crum v. Crum, 231 Mo. l. c. 638 et seq. and cases cited; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. l. c. 699; Meier v. Buchter, 197 Mo. 68.]"

**Testamentary Capacity.**

Whatever the cause may be, if the mind of the testator does not measure up to the standard fixed by **Senile Dementia.** this rule he is incapable of making a will. It is neither true that every weakness incident to age and disease incapacitates a man for making a will nor is it true that a lack of testamentary capacity is any less fatal to the legal power to make a will because it is the result of these things. Senile dementia begins gradually, is progressive in character and in its advanced stages "the brain is well-nigh stripped of its functions." The difficulty lies in determining the point at which in its progress it has so impaired the faculties that they fall below the mark of legal capacity. [Bensberg v. Washington University, 251 Mo. 1. c. 658.] Of this affliction learned authors say that it "begins, as a rule, so gradually that its boundary line cannot be fixed. It is marked by progressive decay of the mental faculties, of which memory is one of the first to fail; and the loss of memory is at first more marked for recent than for remote events. The instincts and affections change, the tastes alter, and the sense of delicacy often suffers. In the purely intellectual sphere we observe an impaired judgment and a weakened power of attention. There is apathy, indifference to current events, and a disposition to be interested in trifles. The emotions become unstable. Some of these patients are irritable, easily excited, prone to weep easily and without much apparent cause. . . . A not unusual form of senile dementia is a type of delusional insanity. In advanced cases, especially, in which all the mental and moral faculties are clouded, delusions are observed. These delusions are usually of a depressive or persecutory kind; a common one is the idea of loss of property, or of being robbed." [1 Wharton & Stille's Medical Jurisprudence, secs. 975, 976.]

In the same connection the same authors say: "In advanced senile dementia the brain is well-nigh strip-

ped of its functions. Nothing can exceed the complete-
ness with which this reduction is sometimes effected
in old age, unless it be in general paresis; and, in
fact, the terminal stages in the two conditions are not
unlike. The patient's mind is indeed 'sans every-
thing.' " [Id., sec. 979.]

After a careful examination of the evidence in
this case the conclusion has been reached that the evi-
dence was sufficient to require the submission to the
jury of the issue as to testamentary capacity. The
question now is not what conclusion this court might
reach on the facts in the record nor what conclusion
this court might think the jury ought to reach but
merely whether there is evidence in the record which,
if the jury chose to believe it, would support a verdict
for contestant.

In view of the fact that a retrial is probable and
that, as a consequence a detailed discussion of the evi-
dence is inadvisable (Turner v. Anderson, 236 Mo. l.
c. 544) it will be sufficient to point out that there is
evidence of most of the mental changes incident to the
progress of senile dementia, as described by the text
book quoted and also by Dr. Woodson, a witness in the
case and himself a man of large experience in the ob-
servation and treatment of diseases of the mind. There
was also evidence that testatrix labored under persis-
tent delusions that her property was being stolen, de-
lusions asserted by the authority quoted to be char-
acteristic of the advanced stages of senile dementia.
In addition, it is to be remembered that the reason
given by testatrix for the provisions in her will limit-
ing the devise to contestant to a life estate was her
belief that contestant's husband had dissipated the
proceeds of the sale of a piano and of certain house-
hold goods, and the fear arising out of that belief that
a like fate would overtake the property devised to
contestant if her interest was not limited and a trus-
teeship created. There was evidence this belief had

no foundation in fact but was a mere delusion. Of its effect in producing the provision in the will to which contestant objects proponents' witnesses leave no doubt. While the difficulty in determining just where testamentary capacity ends in a case of this kind is frequently great, yet there is substantial evidence in this case both of a particular delusion which induced the execution of the will in the form it took and, also, of the presence of senile dementia in a stage so advanced that the jury would, if they believed that evidence, have been justified in finding a derangement of mind so general and complete as to render testatrix incapable of making a will. [Buford v. Gruber, 223 Mo. l. c. 251.] It is true that there was evidence testatrix managed her property during her life but that evidence was not clear as to how successfully she did this. It fell short of a showing sufficient to justify this court in saying it put her sanity beyond question.

The principal insistence, however, is that there was no direct evidence that on the day and at the hour the will was signed testatrix was insane. **Presumptions from Proof of Permanent Insanity.** It is undoubtedly true that the real question is as to the sanity of testatrix at the time she signed the will (Von DeVeld v. Judy, 143 Mo. l. c. 363; Winn v. Grier, 217 Mo. l. c. 451) but it does not follow that the proof of testamentary incapacity at that very moment must be made by eyewitnesses on that occasion. Proof of insanity permanent (and here progressive) in its nature raises a presumption of continuity which it is incumbent upon proponents to rebut, and substantial evidence of mental unsoundness of that character with the evidence of proponents to the contrary generally ought to be sent to the jury so that they may resolve the conflict. [Buford v. Gruber, 223 Mo. l. c. 253.]

In the case of Von De Veld v. Judy, relied upon by respondents, there was a verdict establishing the will, and the question there presented was somewhat

different from that in this case. Further, the peculiarities attributed by the witnesses to the testator in that case were observed while he was under the influence of fever and drugs, and the court explicitly points out the fact that incompetency arising out of "imbecility" produced by the violence of disease and the inordinate use of drugs, "coupled with the increasing infirmities and feebleness of age, would not raise any presumption of continuity," the cause being . temporary and that there was *abundant* evidence of competency on the day the will was made. The case is not an authority for the conclusion there was in this case no evidence to take the issue as to testamentary capacity to. the jury. Counsel also cite Winn v. Grier, supra, but an examination of that case discloses that the facts are widely different from those in the case at bar. In that case even the expert called by contestants was careful to avoid saying that testator was insane. A detailed comparison of the facts in that case with those the evidence in this record tends to prove would be unprofitable. The result of that comparison clearly discloses a considerable dissimilarity. Each case must be decided on its own facts.

In view of these considerations the conclusion reached is that the trial court erred in taking from the jury the issue as to testamentary capacity.

III. In view of the fact that proponents attempted to show competency by evidence that testatrix successfully managed her property approximately until her death, there seems to have been no good reason for excluding evidence that her management of it had been unsuccessful. On a retrial any evidence tending to show the receipt by testatrix of money or property coupled with evidence that she dissipated it ought to be received in case proponents endeavor to make her business management the basis of an inference of tes-

*Evidence: Management of Property by Testator.*

tamentary capacity. In fact, on such an issue the transactions of testatrix, within reasonable limitations as to time, all become competent.

In case the character of the evidence on a retrial is the same as in this record, the issue as to undue influence should not and that as to testamentary capacity should be submitted to the jury. The judgment is reversed and the cause remanded. *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur, except *Woodson, P. J.,* not sitting.