MAUD B. PICKETT, Executrix, et al., v. JAMES F. COOPER, et al., Defendants, JAMES F. COOPER, Appellant.—No. 39456.—192 S. W. (2d) 412.

Division One, January 7, 1946.

Rehearing Denied, February 11, 1946.

*Don C. Carter* and *J. W. Buffington* for appellants.

*Howard F. Major, Ralph Nolen* and *Olliver W. Nolen* for respondents.

**VAN OSDOL, C.**—This is an action to contest the will of Walter S. McColly devising and bequeathing realty and personalty of approximate value, $21,000. Testator's mental capacity was the issue; and the jury found the purported will was not the last will and testament of deceased. Defendant-proponent, James F. Cooper, the residuary legatee, has appealed from the ensuing judgment.

Walter S. McColly died December 18, 1943, at the age of eighty years. The contested instrument had been made on November 3, 1943, while testator was confined in General Hospital at Mexico, Missouri. Testator was not survived by children or other descendants, and his wife had died April 5, 1938; but he was survived by two brothers, two sisters, two nephews and four nieces. The original contestants were the then living brothers and sisters of testator, and his nephews and nieces who are the children of a deceased sister. A brother, contestant, has died since the trial of the cause and his executrix has been substituted as a party plaintiff.

By the contested will testator devised his eighty-acre farm to his brothers and sisters; town lots to a friend; bequeathed sums of money to churches, friends, and a niece; and gave the residue and major portion of his property to James F. Cooper, appellant, cashier of the First National Bank of Mexico. James F. Cooper was also designated executor with bond.

As stated, the issue submitted to the jury was the mental capacity of Walter S. McColly to make a will; and it is contended by

914

appellant there was no substantial evidence introduced to sustain the finding that McColly did not have the mental capacity to make testamentary disposition of his property. In the review of this contention, the evidence will be viewed in the most favorable light to plaintiffs (respondents), the verdict of the jury being in their favor. Dowling v. Luisetti, 351 Mo. 514, 173 S. W. 2d 381. In determining the sufficiency of plaintiffs' evidence we must put the defendants' evidence out of consideration, save as it may aid plaintiffs' case, and must accept plaintiffs' evidence as entirely true and give plaintiffs the benefit of every inference legitimately to be drawn therefrom. Fowler v. Fowler, 318 Mo. 1078, 2 S. W. 2d 707. As in other actions at law where an issue is submitted to the jury, so in an action to contest a will, an appellate court does not pass upon the weight of the evidence but may determine whether there was any substantial evidence to submit a given issue to the jury. Smith v. Fitzjohn, 354 Mo. 137, 188 S. W. 2d 832; Dowling v. Luisetti, supra.

Testator for many years had resided on his eighty-acre farm, mentioned supra, situate in Audrain County near Rowena, until the death of his wife; and thereafter testator lived variously at the homes of others in Audrain and Boone counties. For about seventeen years preceding his death, he had been in ill health at times and had been treated at several hospitals. After the death of his wife, he had become dissatisfied and restless; "he could not get reconciled." Dr. F. L. McCormick, in whose hospital at Moberly testator was treated from January 13 to January 21, 1942, testified that testator was then in poor health. He suffered with "hydro-achloridia," or lack of acid in the stomach. He was mentally deranged. His mind was absolutely unsound. He was suspicious of the food. He would get out into the hall when he was supposed to be in bed. "We took his clothes out of the room and he would get out in the hall without any clothes on except his underclothes. He would pile chairs up against the door to keep people from coming into the room and he would talk to himself." Testator had been brought to the McCormick hospital by Dr. M. C. McMurray of Paris. Dr. McCormick stated, ". . . I had to call Dr. McMurray to take him home because we could not care for that type of patient." It was Dr. McCormick's opinion that testator could not transact any business when he "was at my place . . ." because "he could not carry on a conversation . . . he didn't know anything." In the doctor's opinion, testator's condition would get worse.

Dr. McMurray, to whose hospital at Paris testator was taken January 21st, testified that testator was afflicted with senile dementia due to hardening of the arteries of the brain. When Dr. McMurray went to Dr. McCormick's hospital to get testator, "Mr. McColly was in the room and had the door barred with chairs and had a chair up in his

arms. I pushed the door open and he was against the door and I pushed the door open and he was there with a chair up this way (indicating). I got hold of the chair. He was no trouble for me to handle and I finally got him quieted down . . . . He acted very well, coming home. . . . and when we got out of the car McColly started on down the street . . . and he said he was going home . . . I got hold of him and took him up to the room. . . . and he hollowed and fought and we had to overpower him to get him in . . . Then for a week or ten days, we had to give him medicine to keep him quieted down. He would not eat. We had to force down what we got him to take and finally he began to get a little better . . .'' Testator remained in the McMurray hospital until February 25, 1942. The doctor stated that testator never was mentally right while he was there. ''I was satisfied that he would not get well, but he might temporarily get better.'' The doctor saw testator in the month of August, 1943, ''. . . when I saw him he was not right but he could get around and do a little business, at times.''

Dr. George M. Ragsdale, a physician of Paris, had examined testator at the McMurray hospital on January 22, 1942. Testator was incoherent and in a delirious state—''liable to tell you anything.'' He had pronounced arteriosclerosis and senile dementia. Witness again saw testator in February 1943, ''He would get on a subject and before you could answer he would jump over to another . . . I could not at any time engage him in an intelligent conversation.'' Dr. Ragsdale saw testator ''off and on all that summer'' and could not see any improvement. ''I say he was a person of unsound mind.'' In a pronounced case of arteriosclerosis, the ''brain blood vessels can become so hard the brain doesn't get the proper nourishment and therefore the man is suffering, we say, with softening of the brain.''

Plaintiffs' lay witnesses, including testator's two brothers, a sister, and a niece (and others) testified of the conduct of the testator in the latter years of his life.

Testator, who had moneys deposited in banks and invested in postal savings certificates, forgot where his postal savings certificates were; he got the First National Bank of Mexico confused with the First National Bank of Centralia. He threatened to take his life. He offered to will his property to a witness to whom he was in no way obligated or related. ''He said that Potter (husband of a niece) was trying to rob him.'' He was fearful that somebody would take the money out of the estate of William E. McColly, an estate of testator's deceased brother which was then in process of administration. He hid his best suit in a newspaper and would complain of people stealing his clothes. He thought someone had stolen the door off a building on his farm. He said, ''That little Doctor and Cooper is trying to beat me out of what I have got.'' He expressed that ill feeling existed between him and his brothers and sisters; said they were not treating

him right and were trying to get his money. According to his brother, Frank, "All there ever was betwixt us was, when my father and mother died we didn't agree on the estate and sold the farm. We just kind of agreed to do it." Testator said, "the Potters were mistreating him and were not giving him anything to eat." He would take the "stobs" out of a plank on the back side of an outside toilet, and would set the plank aside. When hoeing the garden, he would cut the "weeds and beans and everything." He was careless about his dress, and "once or twice" exposed his person and "private parts," although a woman was there present. "He would lay his victuals outside his plate on the table, instead of putting them in his plate." When in General Hospital at Mexico in the latter part of October 1943, "It seemed he felt terribly abused by everybody. . . . he thought they were trying to poison him. . . . he seemed to think everyone was trying to get his money ▉▉▉ away from him." Other acts and eccentric conduct were related by plaintiffs' witnesses.

(Some of the conduct related by the lay witnesses was not such as would justify a reasonable inference of unsoundness of mind; nevertheless the witnesses were permitted, over objection, to express such an opinion of testator's mental condition. Of this appellant complains, and this contention of error will be considered infra.)

When the contested will of November 3d was executed, testator was acting as executor of the will of his brother, William E. McColly, who had died in February 1943. The brothers had executed reciprocal wills. In the spring after his brother's death, testator made a will devising his eighty-acre farm to Anna Pearl Potter (the niece to whom he bequeathed a legacy, $500, in the will of November 3d), who, he had said, was his favorite niece; residue to his brothers and sisters and the children of his deceased sister. He executed another will October 11, 1943, in which he bequeathed legacies of $200 each to two friends and devised and bequeathed the residue of his property to I. W. Potter and Anna Pearl Potter (his favorite niece), husband and wife. The day preceding the execution of the will contested in the instant case, testator (then, as stated, confined in General Hospital at Mexico) told I. W. Potter, "You haven't treated me right, you haven't been to see me but twice in seventeen days and I think you are neglecting me, . . . I am going to make another will and leave you out." The residuary legatee (appellant) of the will of November 3d was not related to testator and had done nothing for him except "as a customer of the bank."

We have seen that three physicians testified of the testator's mental deterioration. These physicians did not treat or examine the testator within several months preceding the execution of the will. Two of the physicians, however, had seen and talked with testator in the summer of 1943. He was "not right," and no improvement could be seen.

The mental disorder, senile dementia, with which testator was afflicted, "is marked by progressive decay of the mental faculties, of which memory is one of the first to fail; and the loss of memory is at first more marked for recent than for remote events. The instincts and affections change, the tastes alter, and the sense of delicacy often suffers. In the purely intellectual sphere, we observe an impaired judgment and a weakened power of attention. . . . In advanced cases, especially, in which all the mental and moral faculties are more or less clouded, delusions are observed. These delusions are usually of a depressive or persecutory kind; a common one is the idea of loss of property, or of being robbed; . . ." Vol. I, Wharton & Stille's Medical Jurisprudence, secs. 975-6, pp. 794-5; Hamner v. Edmonds, 327 Mo. 281, 36 S. W. 2d 929; Byrne v. Fulkerson, 254 Mo. 97, 162 S. W. 171.

It is neither true that every weakness incident to age and disease incapacitates a man from making a will, nor is it true that a lack of testamentary capacity is any less fatal to the legal power to make a will because it is the result of these things. Byrne v. Fulkerson, supra. Testimony of plaintiffs' lay witnesses, which we have quoted supra, relating to testator's eccentric conduct might not alone be considered sufficient evidence to overthrow a will on the ground of mental incapacity; nevertheless, such evidence may be taken into consideration with other facts in determining whether testator is of such mental incapacity. Proffer v. Proffer, 342 Mo. 184, 114 S. W. 2d 1035. But the testimony and opinions of plaintiffs' medical witnesses, who had treated and examined testator, that testator had senile dementia, a progressive mental disorder, especially when considered in conjunction with the testimony of the lay witnesses of and concerning the continuing eccentric conduct characteristic of such dementia, was sufficient in our opinion from which it could be reasonably inferred that the testator did not have the legal mental capacity to dispose of his property by will at the time the purported will was executed. We hold the issue of mental capacity was submissible to the jury. Proffer v. Proffer, supra; Fields v. Luck, 335 Mo. 765, 74 S. W. 2d 35; Hamner v. Edmonds, supra; Moll v. Pollack, 319 Mo. 744, 8 S. W. 2d 38; Byrne v. Fulkerson, supra.

By Instruction A, given at plaintiffs' instance, the court advised the jury that it devolved upon defendants to show that testator was of sound and disposing mind and memory, that is, "that he had mind and memory capable of comprehending the nature of the transaction in which he was engaged, and the disposition he was making of his property, and generally the nature and extent of his property, so as to enable him to fully contemplate and know those who were the natural objects of his bounty, *that he had sufficient mind and memory to do these things without the aid of any other person* . . ." (Our italics.) Instruction No. 9, given at the defendants' instance,

substantially followed the language of plaintiffs' Instruction A quoted supra and, continuing, advised the jury that "by this *is not meant that the testator must,* at time of the execution of the will, *be able without aid or assistance to recall each item of his property, or the governmental description of each tract and parcel of land* which he may own, or the individual names of all of his debtors . . ." (Our italics.) Appellant urges that the italicized qualifying clause of defendants' Instruction No. 9¹ was in conflict with the italicized clause of plaintiffs' Instruction A, and the two instructions were thus confusing and misleading. The phrase, "without the aid of any other person" as used in plaintiffs' Instruction A has had the sanction of this court. Holton v. Cochran, 208 Mo. 314 at page 423, 106 S. W. 1035 at page 1068; Crossan v. Crossan, 169 Mo. 631, 70 S. W. 136. The qualifying clause, "by this is not meant that the testator must . . . be able without aid . . . to recall each item of his property (etc.)," contained in defendants' instruction (Instruction No. 9) defines the extent of the meaning of the clause "that he had sufficient mind and memory to do these things without the aid of any other person." We believe the instructions were not in conflict. See Schultz v. Schultz, 316 Mo. 728, 293 S. W. 105, where an instruction containing the substance of the italicized clauses of both instructions was tacitly approved.

Appellant contends the trial court erred in refusing to give defendants' Instruction No. 7, which, if given, would have advised the jury that under the law and evidence the verdict should be for defendants on the issue of undue influence. And the appellant contends that the court erred in refusing defendants' Instructions Nos. 3 and 4 withdrawing the issue of the due execution of the will. The issue of undue influence and the issue that the will had not been signed and attested as the law required had been pleaded by plaintiffs in their petition, but no substantial evidence was introduced to sustain these issues, and, as stated, the trial court submitted only the issue of mental capacity. The issues of undue influence and that the will had not been duly executed were abandoned. There was no error in the refusal of Instructions Nos. 3, 4 and 7. It is not presumed that the jury found for plaintiffs upon an issue which was not supported by substantial evidence and which was not submitted, where, as here, the jury was guided by given instructions as to the issue, mental capacity, to be determined. Dietzman v. St. Louis Screw Co., 300 Mo. 196, 254 S. W. 59; Scott v. Kansas City Public Service Co., Mo. App., 115 S. W. 2d 518; Vol. 1, Raymond, Missouri Instructions to Juries, sec. 12, p. 20.

Of appellant's contention the trial court erred in permitting nonprofessional witnesses to give their opinion that testator was of unsound mind. The contention is ruled adversely to appellant. The trial court, before permitting a lay witness to state an opinion that

testator was of unsound mind, heard the witness state his opportunity to observe testator and the witness' statement of facts upon which his opinion was based. The trial court being so advised, the receipt of the witness' opinion into evidence was within the trial court's discretion—in reading the entire record we see no clear abuse of discretion. Of course, a witness' opportunity to observe and his knowledge of facts primarily bear upon the value and weight of his testimony. It is held that a lay witness may state an opinion that a testator is of unsound mind, if the witness has had a sufficient opportunity to observe testator and relates facts (bases of his opinion) from which unsoundness of mind can be reasonably inferred, taking into consideration the surrounding circumstances and the person whose sanity is questioned. Smith v. Fitzjohn, supra; Lee v. Ullery, 346 Mo. 236, 140 S. W. 2d 5; Clark v. Commerce Trust Co., 333 Mo. 243, 62 S. W. 2d 874; Berkemeier v. Reller (Mo. Sup.), 37 S. W. 2d 430. Lay witnesses should not be allowed to give their opinions that a testator is of unsound mind, absent qualification as thus determined. The rule protects the parties in interest, the jurors and the court, against mere conclusions as to mental incompetency. Lee v. Ullery, supra. However, the trial court's inquiry into the lay witness' opportunity to observe and into the facts related upon which the witness bases his opinion may be said to partake somewhat of the nature of a voir dire inquiry (although in the presence of the jury) enabling the trial court to determine the qualification of the witness to state such an opinion or inference. And the shown extent of a lay witness' opportunity to observe and the related facts upon which he bases his opinion also fulfill the primary purpose of the inquiry, that is, to enable the jury to correctly weigh and evaluate the opinion. Now (although a trial court may have erred in permitting a lay witness to express an opinion that a testator was of unsound mind) the jury, having heard the lay witness state the bases of his opinion, may nevertheless see that the expressed opinion is of no value. So, since it is often difficult to determine whether the witness is competent, it is said that the question whether sufficient opportunity to observe, and whether sufficient facts have been related to warrant the receipt of the opinion or inference, rests in the discretion of the trial court; and its action will not ordinarily be reviewed, although it is subject to reversal in extreme cases where an improper exercise of discretion appears. Fields v. Luck, supra; 32 C. J. S., Evidence, sec. 507 at page 176. And see discussion in State v. Jackson, 346 Mo. 474 at page 481, 142 S. W. 2d 45 at page 49; 20 Am. Jur., Evidence, secs. 773-4, pp. 645-6; Vol. III, Wigmore on Evidence, 3d Ed., sec. 689, pp. 9-10.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.