WILLIAM DOWLING, KATIE DOWLING and DORA DOWLING BOYLAN v. DELLA LUISETTI, Appellant.—No. 38439.—173 S. W. (2d) 381.

Division One, July 6, 1943.

Rehearing Denied, July 20, 1943.

*H. A. & C. R. Hamilton, Robert A. Hamilton* and *Henry A. Freytag* for appellant.

*James E. Crowe, Frank E. Morris* and *Walter N. Davis* for respondents.

HYDE, J.—This is an action to contest a will, submitted only on the ground of mental incapacity. The net amount of the estate, after deducting claims, was $11,765.56. The jury found for plaintiffs and judgment was entered setting aside the will. Defendant (sole beneficiary under the will) has appealed. Her contention is that plaintiffs had no substantial evidence of mental incapacity and that the court should have directed a verdict in her favor.

Defendant claims the estate involved under the will of Patrick Dowling who died on April 29, 1940, at St. John's Hospital [382] in St. Louis at the age of 80 years. He had been a steel worker but had retired about 1930. In 1934 he moved into a hotel operated by defendant and her husband. He was in reasonably good health and able to attend to his own affairs up to 1940. He suffered to some extent from arthritis (for which he took occasional medical treatments) but was able to walk without a cane. He was somewhat deaf and it was necessary to speak to him in a rather loud voice. His handwriting became shaky during the last few years of his life and the First National Bank, where he had a savings account, required fingerprints on his checks for better identification. He became very ill dur-

ing the first part of April 1940 and stayed in his room where he was attended by Dr. Montani, the family physician of defendant and her family. He was very much opposed to going to a hospital or even consulting a doctor.

Dr. Montani first saw him on April 4th. He "noticed a swelling of his feet, and hands, reaching about halfway up to his knees, . . . and gave him a partial physical examination, enough to find that he was ailing from cardiac dropsy or myocardial weakness, . . . He had a pitting edema, which you find in these cases of myocardial weakness or early heart failure." ("Edema" means a swollen condition caused by fluid in the tissues.) On April 9th he saw "very little improvement in his general condition. His pulse was slow, but his edema was the same. His weakness and shortness of breath was the same." Dr. Montani advised that he go to St. John's Hospital, where he was staff physician. After inquiring about the cost there, Dowling decided to go to the City Hospital. Defendant went with him in the ambulance. The next day, April 10th, the will was executed there. On the following day, April 11th, he was removed to St. John's Hospital. He died on April 29th. Dr. Montani said his death was due to "general degeneration of his cardiovascular renal system."

All the testimony as to the making of the will comes from defendant's evidence, introduced to establish the will. Before Dowling went to the hospital, according to defendant's testimony: "He said, 'Della, I want you to go down to the bank with me. Something I want to do.' He said, 'You are going to be surprised.' So I ran downstairs right away; I asked the doctor. He said, 'No; it is too cold.'" (Defendant told her sister about this conversation and she thought it meant that he wanted to make a will.) When he got to the City Hospital, his watch and fifty dollars in currency was taken from him at the office. Then some of the attendants asked questions about his income and resources. He resented this questioning and "He said, 'None of your business.'" Defendant further testified that Dowling then said: "'Della, go home and call somebody; call a notary public or somebody; send them right away.' I said I didn't know any one. He said, 'Don't be a fool; go ahead and do it.'" Defendant then called her sister and "told her Mr. Dowling told me to send somebody out to the hospital; he wanted to make a will. She said, 'Well, I know Mr. Hoppe is a notary public.' (He was an undertaker and they used his ambulance.) So she called Mr. Hoppe and Mr. Hoppe said he can't do that by himself; he have to get a lawyer. So my sister say there was somebody she knows; she called Mr. Freytag." (He had previously represented her in making a lease.)

Mr. Hoppe and Mr. Freytag, the attorney, met at defendant's hotel. Neither of them were acquainted with Dowling. Hoppe made arrangements for Dowling to be moved into a private room. He introduced himself to Dowling and then introduced Freytag, who asked

him if he wanted to make a will and he said he did. Freytag testified, as to what then occurred, as follows: "I asked him whether he owned any real estate. He said, 'No.' I said, 'Any stocks or bonds—anything of that nature?' He said, 'No.' . . . I said, 'What is it? Just cash?' He said, 'Just cash.' I then asked him whether or not he had made a previous will. He said he had not. . . . I asked him whom he wanted to leave his money to or his property to. He said, 'To Della.' I said, 'Do you mean this lady, Mrs. Luisetti?' He said, 'Yes; Della Luisetti; my friend, Della Luisetti.' I asked him whether or not he had any relatives. He appeared to be just a bit disturbed about the number of matters I was asking him. In reply to my question whether or not he had any relatives, he said, 'No; haven't heard from anybody in a long time.' I said, 'You haven't any relatives?' He said, 'No relatives. I haven't heard from anyone in a long time. Everything to Mrs. Luisetti.' I asked him who he wanted to name as the person to administer his estate. He said, 'Mrs. Luisetti.' [383] I asked him whether or not a bond should be required and he said, 'No.' He said, 'Everything to Della.' "

Freytag further testified that he wrote the will longhand and read it to Dowling and said, " 'Is that the way you want it?' He said, 'Everything to Mrs. Luisetti.' I said, 'yes,' and he repeated the question . . . 'Now, is everything in this going to Mrs. Luisetti?' I said, 'Yes. Is that the way you want it?' And he said 'Yes.' I then took the piece of paper, the second page, . . . and passed it over to him for his signature. He looked at me and smiled a little bit, sort of referred to his hand; he said, 'I can't write very well. I will make an X mark.' I thought for a moment; I said, 'Well, that's all right.' He took the pen in his hand, made an X mark, . . . " The signature by mark and the will were both witnessed by Freytag, Hoppe and one of the staff doctors. (This doctor had left the state and did not testify at the trial.) Hoppe's testimony corroborated that of Freytag. Immediately after Dowling's death defendant made a contract with Freytag for a 33 1/3% contingent fee if the will were sustained. Defendant, however, was represented by other attorneys at the trial; Freytag, having been inducted into military service, was on leave to testify as a witness.

The will contained only three provisions as follows:

"Item I. I direct that all my just debts and funeral expenses be paid, as soon after my decease as may be found convenient.

"Item II. Because of the many kindnesses rendered to me by Mrs. Della Luisetti during the past seven years and since I have no close living relatives and not having seen or heard from any relatives for many years, all the rest, residue and remainder of my estate, whether real, personal or mixed of whatever nature and wheresoever situated, which I own or have the right to dispose of at the time of

my decease, I give, devise and bequeath absolutely and forever to my friend, Mrs. Della Luisetti of St. Louis, Missouri.

"Item III. I hereby nominate, constitute and appoint my friend, Mrs. Della Luisetti as Executrix of this my last will and testament and request that she be not required to furnish bond as such and I direct my said executrix to arrange my funeral."

Defendant testified that when she visited the hospital on the afternoon of April 10th after the will was made, Dowling said: " 'Della, I just make a will.' He said, 'Don't forget, everything is going to be for you.' He said, 'Don't let nobody take anything.' . . . He said, 'I want everything to be for you. I want you to go down in the office and get everything they got. Get my watch, and I got fifty dollars. Go down and get it.' " Dowling also said he did not want to stay at the City Hospital so defendant called Dr. Montani and he made arrangements for him to be taken to St. John's Hospital in Hoppe's ambulance. Dr. Montani testified as to his condition there as follows: "The man improved for the first five or six or seven days. . . . he was still alert, recognized me when I would walk in, but after the 20th or 21st he started becoming drowsy and stuporous, until, around the 25th or so, he more or less was in a comatose state. . . . around the 19th he started to show some evidence of drowsiness, but he could still be aroused and could answer questions."

Plaintiffs are the brother and two nieces (daughters of a deceased brother) of Dowling. The nieces were born after he left Ireland, before 1900, and never saw him. A brother Matthew also came to America with Patrick. Matthew was killed in an accident in 1912. Patrick Dowling attended to sending money left by Matthew to the two brothers in Ireland. He later carried on correspondence with his nieces, writing one or two letters each year. The last letter received from him was dated November 17, 1936. The last letter written to him was dated May 29, 1939. He sent his nieces money at times before 1933 which amounted in total to more than one thousand dollars.

Mrs. McMahon, who lived in St. Louis and was acquainted both with Patrick Dowling and his brother Matthew, testified to the following conversation, concerning his correspondence with his nieces, in 1936: "He told me that the (youngest) girl was getting married. She had written and asked him for four hundred dollars. I asked him if he was going to send it. He said, well, he didn't think so, because he said he wasn't working and he knew he was going to live for many years, and he said, 'They will get it anyway; they might need it worse after they grow older.' " She further testified that she saw Dowling at defendant's hotel in February, 1940, and that he said "As soon as the weather would get [384] fine, he would be out to see me. Then I asked him, I said, 'Have you heard from Ireland lately?' He said, 'About six months ago.' " She said he did not appear to be well at that time, "seemed kind of dazed." Defendant had evidence that

Dowling said he had helped his relatives enough and was through with them. All witnesses agree that he was a man of strong will, attended to his own business and let no one know anything about it. He had saved more than $13,000.00 from his wages and kept it on time deposit at the Boatmen's Bank. He was much interested in current affairs and also went daily to the public library to read historical and scientific books. He liked to discuss these matters with friends at defendant's hotel.

Plaintiffs introduced in evidence the City Hospital record which contained the following statements: "Patient was admitted to the City Hospital on April 9th, 1940. No diagnosis. Patient is unable to give lucid picture of his present illness. Accompanying friends know only that he has been feeling bad lately and has had dropsy and a weak heart for some time. . . . Patient is an uncooperative senile white man of 80 in no acute distress. . . . Back: 3 plus sacral edema. . . . Extremities: 3 plus edema of upper extremities to midforearm, of lower extremities to knees. . . . Impressions: 1) Arterio sclerotic cardiovascular disease with decompensation. 2) Senility. 3) Possible Nephrosis or Nephritis. 4) Nutritional edema (?) . . . Signed out to a friend before he could be diagnozed." Plaintiffs also introduced the St. John's Hospital record in which it was stated:

"Admitted 4-11-40    Died 4-29-40
 Diagnosis:     Result:
 Senility.      Expired
 Uremia.
 Chronic Nephritis.
   Chas. Montani, M. D. . . .

"Extremities—Arms are edematous more on the left. Feet also edematous, not as much as the arms. Reflexes are sluggish. Impression: Cardio renal vascular disease. Senility. Neurasthenia. Dr. Catanzaro. . . . Course & Observation. Patient admitted conscious and rational. See History and Physical. Dr. Catanzaro."

Plaintiffs had two physicians (Dr. E. F. Sassin and Dr. R. E. Britt), specialists in mental and nervous diseases, testify as expert witnesses. Neither of them ever saw Dowling and each was asked his opinion as to his mental capacity based upon hypothetical questions assuming the following facts: Now, assume that at the time a man is claimed to have executed his will, he was eighty years old; that he was suffering from ailments diagnosed as chronic nephritis, uremia, senility, neurasthenia, swelling of the hands and feet from nephritis or malnutrition, and dropsy of the hands and feet and back, and that on admission to a hospital he was unable to give a lucid description of his illness; that he was unable to write his name, although he had formerly been able to write well; that he had a brother and nieces,

to whom he had written about four years before and of whom he had spoken a few months before this time, but at this time he stated that he had no close relatives."

Dr. Sassin anwered this question, and then explained his answer, as follows: "A. I don't believe he was capable of understanding the nature of the transaction, nor do I believe that he was competent to make this transaction. Q. Doctor, on what do you base your conclusion? A. On the facts that you have stated, the medical facts, and *my impression* is that this individual was suffering from a confusional psychosis. Q. Would you explain that further, doctor? A. That he was confused, and further that he did have an organic condition that—you say "edema"; that would necessarily have also caused some edema of the brain. That he was confused and was acutely ill and incompetent. Q. How does nephritis contribute to that confusion? A. Nephritis is one of the main factors, I believe, here. Q. How does that contribute to this confusion? A. In that he had, *apparently*, some disease of the arteries, and the edema was generalized; general edema of the body, including the brain; swelling and fluid. Q. Does the fact that he had dropsy at that time have any bearing upon it? A. Dropsy is part of the general edema. Q. What does dropsy generally do to an individual? A. There is fluid in the tissues. Q. What about neurasthenia, doctor? A. The neurasthenia has no meaning to me here. Q. What do you mean? A. In relation to this individual. [385] Q. Do you place any importance on the fact that he was not able to remember some close relatives at that time? A. I do. Q. What does that show? A. Shows that his consciousness was clouded; *may have been* disoriented. . . . He *probably* didn't know the people about him or facts about him or time about him. In other words, his relationship to himself or to his environment or to time. . . . In this case I would say that the edema is generalized; included the brain as well as the rest of the organs. . . . *I understand from the question he was confused.* . . . Q. What part of the question do you base that on? A. There was something about answering questions when he was brought into the hospital; about being unable to write as usual; that there had been change in his attitude regarding his people; that he also had this generalized condition."

Dr. Britt testified as follows: "The fact that he is unable to give a lucid account of his illness, the fact that he is unable to recall some relatively close members or theoretically close members of his family by name, the fact that he ignores their existence completely, and also the fact that he is unable to sign his name properly, whereas, heretofore, his penmanship has been, we will say, average. I would say that, with all of those facts together, that he would be incapable of entering into such a transaction or understanding its nature. . . . I would say that he was *probably* suffering from some confusional state

which was symptomatic of his physical condition, namely, secondary to the nephritis, the uremia and that sort of thing. . . . in the case of nephritis *probably* all of your tissues would be involved with the swelling, with the fluid and the nitrogenous or the toxic products which they contain. This would affect not only the hands or feet, but the abdomen. It would undoubtedly affect every other tissue as well, and the brain and the nervous system would undoubtedly be affected, particularly in an individual of this particular age, whose ability, due to the incidental changes that occur at this time of life, to excrete waste products is much less or much poorer than yours would be, for instance. Consequently, he would be, undoubtedly, a whole lot more sensitive to them and he would be *much more apt to show* mental impairment on that account." (Our italics.)

Dr. Montani further testified as follows: Q. Was the edema that you found present in Patrick Dowling general or localized? A. I would say it was local, dependent edema. . . . Q. Did you ever find any indications of the edema of the brain? A. No, sir; he showed no symptoms of having any edema of the brain. . . . Q. Did you ever notice any confusion in his mind? A. No, sir. . . . Q. Would you say that Patrick Dowling was a man of sound mind up to the last few days of his death? A. Up to the last, I would say, ten or twelve days, yes."

██ ██ A will contest is an action at law so that the weight and credibility of the evidence is for the jury and we must consider the evidence in the light most favorable to the verdict. But a verdict should be directed in favor of proponent, after a prima facie showing of a valid will has been made, unless plaintiffs produced substantial evidence to show that on April 10, 1940, Dowling did not have sufficient mental capacity to make a will. [Walter v. Alt, 348 Mo. 53, 152 S. W. (2d) 135, l. c. 141 and cases cited.] Here the contestants' case rests entirely upon the testimony of expert witnesses who never saw Dowling. Moreover, contestants produced no witness, either lay or professional, who ever saw him either after he went to the hospital or even when he was confined to his room prior thereto. In fact, the only contestants' witness who ever did see him was Mrs. McMahon who talked to him in February 1940. She did not question his mental capacity at that time. In determining whether or not the opinion of the medical experts amount to substantial evidence we must measure their worth by the value of the evidence upon which they are based. "The question of mental capacity to make a will is a mixed question of law and fact, and the facts on which an opinion, even of a medical expert, is based must, like the facts sufficient to support the verdict of the jury, measure up to the legal requirements. The question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law for this court. This court has a number of times held that the evidence as to unsoundness

of mind is insufficient to support [386] a verdict, though medical experts so testified." [Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S. W. (2d) 664, l. c. 672.]

It clearly appears from the evidence that Dowling's condition from chronic nephritis (commonly known as Brights Disease) and uremia (a more acute condition which developed from it), in connection with general deterioration of his heart and arteries, and dropsical condition (which also developed from the other diseases), brought about a poisoning of his system which ultimately caused stupor and finally impaired or stopped his mental processes. Nevertheless, the decisive question here is: When did this toxic condition sufficiently affect his mind so as to make him mentally incapable of making a will. Dr. Montani (defendant's witness) said he was of sound mind up to the last ten or twelve days. That would be up to at least April 17th, or for about a week after he was brought to St. John's Hospital. Dr. Montani's statement is corroborated by a number of lay witnesses, friends and acquaintances who visited Dowling after he was taken to St. John's. What real basis is there in the evidence for finding that he was of unsound mind when he was in the City Hospital? Plaintiffs' expert witnesses assumed that his conduct on entering the City Hospital indicated mental confusion. But this is based largely upon their interpretation of the notation "unable to give a lucid picture of his present illness." How can an assumption so founded be based on substantial evidence? No one connected with the City Hospital testified as to what kind of a statement Dowling made, what his conduct was, or how he then appeared. This notation is not only a conclusion but is such an indefinite statement that it is impossible to tell what it meant ,without some further explanation. This City Hospital record does show that Dowling did make certain specific complaints, namely, "fullness across stomach" and "tenderness" in certain places. In other words, this notation certainly does not give "a lucid picture" of Dowling's mental condition. On the other hand, the notation on the St. John's Hospital record, "patient admitted conscious and rational", is clear and needs no explanation. Both hospital records were introduced by plaintiffs.

Furthermore, the facts stated in the hypothetical question are not really inconsistent with soundness of mind. The specific ailments listed (nephritis, uremia, dropsy) do not necessarily affect the mind. Certainly not ipso facto or at any particular time. Ultimately the poisoning of the system from them would and did affect the mental processes and finally cause death. But was that stage reached on April 10th? There must be some evidence to show that such a condition existed, at that time, before an opinion as to mental incapacity to make a will, on that date, could have any sound basis. Senility is only old age and neurasthenia (which does not appear on the City Hospital record) "is a mild nervous disturbance" which plaintiffs'

doctor said, "has no meaning here." Certainly the fact that Dowling was unable to write his name showed no more than a weakened condition. He had been unable to write his name very well for years as shown by the shaky specimens of his signature in evidence. The assumption in the question that "he stated that he had no close relatives", does not warrant the further assumption that he had forgotten the existence of these relatives. According to the testimony (Freytag) he said "no relatives, I haven't heard from anyone in a long time." There was no evidence of a discussion of degree of relationship. The fact that he said he had not heard from them indicates his awareness of their existence. It is conceded that he had not written to them for almost four years. We must hold that the opinions of the two experts based only on the facts assumed in the hypothetical question do not constitute substantial evidence of mental incapacity. [See Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72, l. c. 85.]

However, plaintiffs' experts assumed another factor which was not stated in the question; that is "edema of the brain". If there were evidence to support such an assumption, there might be a sound basis for an opinion of mental incapacity. But where is any evidence upon which to base this assumption? There is no such finding noted on either hospital record. Dr. Montani testified that the edema (which means swelling) was a local edema and that "he showed no symptoms of having any edema of the brain." Apparently Dr. Sassin (in the testimony hereinabove set out) assumed that Dowling was mentally confused because of the notation about inability "to give a lucid picture of his present illness", then assumed that he had an edema of the brain because he was confused, and then assumed that because of the [387] edema of the brain "he was confused, and was acutely ill and incompetent." Dr. Britt also assumed that Dowling's condition had already affected his brain when he was taken to the City Hospital leaning heavily upon the same notation. Both doctors explained the toxic condition arising from nephritis and uremia and the probability that it would ultimately affect the mental processes. This is to be conceded, but it also appears from their testimony that not every case of nephritis or uremia would affect one's mental capacity. It further appears that there are usually stages where these diseases would not affect mental capacity as well as later stages in which they would. Plaintiffs had the burden of proving mental incapacity. We must hold that they failed to meet this burden when they produced no witness who ever saw Dowling, at any stage of his last illness; but had only opinion evidence, as to his mental incapacity at the time the will was made, based on what it was thought his condition probably might have been upon consideration of assumptions not established by evidence. To hold otherwise would be to set aside a will merely upon suspicion and conjecture without substantial evidence.

The judgment is reversed and the cause remanded with directions that a judgment be entered establishing the contested will as the last will of the testator. All concur.

## On Motions for Rehearing and Transfer to Court en Banc.

HYDE, J.—Plaintiffs have filed motions for rehearing and transfer to Court en Banc relying upon Muller v. St. Louis Hospital Assn., 5 Mo. App. 390, approved and affirmed by this court, 73 Mo. 242. They say: "the facts in the case herein and the Muller case cannot be distinguished", and that we should follow it or overrule it. However, the Muller case was not really submitted on mental incapacity but on undue influence (the instruction authorizing a verdict was on that theory) while here there was no such submission, or contention that there was evidence to support submission on that ground. Moreover, in the Muller case the will was drawn by the spiritual advisor of the alleged testator, a priest who named himself as executor and who provided therein for a bequest to the institution with which he was connected. Furthermore, in the Muller case the will contained a positive misstatement concerning the members of the family of the testator *who were therein designated to receive bequests* (three sisters when he only had two) and it was shown that he was under the influence of opiates at the time it was claimed the will was read to him. Clearly there was substantial evidence in the Muller case to warrant submission of the issue of undue influence.

The motions for rehearing and transfer to Court En Banc are overruled. All concur.