Ronald COMPTON, Plaintiff–Respondent,

v.

Norman COMPTON,
Defendant–Appellant.

No. 42023.

Missouri Court of Appeals,
Eastern District,
Division Two.

Sept. 16, 1980.

William G. Reeves, Farmington, for plaintiff-respondent.

Robert J. Blackwell, Flat River, for defendant-appellee.

LACKLAND H. BLOOM, Special Judge.

On April 18, 1979, respondent, Ronald Compton, filed a petition pursuant to Chapter 475 Revised Statutes Missouri, 1978 [1] alleging that appellant, Norman Compton, was incapable of managing his property or caring for himself by reason of habitual drunkenness and seeking the appointment of a guardian of the person and estate of appellant. A trial was held without a jury on May 3, 1979, and on May 7, 1979, the court entered judgment finding appellant incompetent by reason of habitual drunkenness and appointing respondent guardian of his person. The court found that appellant neither owned nor possessed property and accordingly did not appoint a guardian of the estate.

Although appellant sets out three separate points of alleged error, the essence of his appeal is that there was not a sufficent factual foundation for the court to permit the lay witnesses and the medical expert to express opinions as to his ability to care for himself or to support the court's finding and judgment that he is incompetent and lacks the ability to care for himself. We affirm the judgment.

▇ At the threshold of this appeal, respondent urges us to dismiss the appeal for the reason that appellant failed to preserve in his motion for new trial the specific points of error now raised. We decline to dismiss the appeal under authority of Supreme Court Rule 73.01(2)(b), which provides in cases tried without a jury neither a motion for new trial nor a motion to amend the judgment is necessary to preserve any matter for appellate review. We review the case on both the law and the evidence as in suits of an equitable nature, disregard evidence deemed not admissible and enter such judgment as is deemed proper giving due consideration to the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(3), Mo.R.Civ.P.

At the time of trial, appellant was fifty-five years of age. He was divorced in 1959 and since then has lived in various states. He has seven adult children who live in Tennessee. In November, 1977, he returned to his mother's home in Leadwood, Missouri after an absence of six years, where he resided until the incidents giving rise to the present proceedings occurred.

Appellant's seventy-nine year old mother, Bertha Compton, testified that on April 6, 1979, he had been drinking. She was watching television when he ran in and cornered her and said he "was going to kill me.... He was going to bust my head wide open." Mrs. Compton stated that he threatened to kill her fifteen times that night. He told her he wanted her dead so he could get her property and told her: "If I told any of my children about this that he was going to sexually abuse me and if I told about this he was going to kill me."

He went in the kitchen about 2:00 a. m. and began throwing knives at the wall and holding a conversation with himself and going into a laughing spell. He hollered, laughed and kicked soda bottles all over the kitchen. He hollered at his mother, cussed her and told her he would kill her if she came in the kitchen. He said he was going to kill all her kids and kill Jesus.

The mother left the next morning and had her neighbor call her son, Ronald, respondent herein, whom she then went to live with in St. Louis. She next saw appellant on April 8 at the State Hospital at Farmington. At that time he was drunk,

---

1. Except as otherwise indicated references to Missouri Statutes will be to the 1978 Revision.

called her and Ronald bad names and said he was going to kill them and the lady doctor. He told her: "I'm drinking and I'm going to and there's nothing you can do to stop me. And I'll kill you if you say your [sic] going to stop me."

The mother also testified that about six years earlier he had come to live with her and his father. "He came off of a big drunk and we let him stay." But later "we had to ask him to leave". When he came to live with her in 1977, she told him he could not bring liquor in the house nor "come in on me a drinking. He agreed but didn't keep his agreement." He became abusive on occasions before April 6, and she would leave the room until he settled down.

On the morning of April 7, after his mother left, appellant entered the house by breaking the door. She had it fixed and he again broke in by pushing out a window. While he lived with her, appellant was not employed and had no income. His only possession when he came was a "hair spray can." Sometimes he did odd jobs around the house, mowing the lawn, fixing the barn or fixing the graves at the cemetery. She could not converse with him because he was incoherent and said things which did not make sense to her. She said she was afraid of him and would not live with him anymore. Over objection, she stated her opinion that her son was unable to take care of himself. On cross-examination she said he could feed himself and "Maybe he could handle his affairs. ... I'd like to see him try ... but I don't think he can."

Respondent Ronald Compton saw appellant about once a month when he visited his mother. When he went there his brother would talk to himself, laugh and carry on what his brother called "enterlectual communication." Appellant would not try to hold normal conversation with him. Appellant admitted to him that he was drinking and that there was nothing wrong with it. The only threat made against respondent was on April 8 when they signed appellant in at the hospital. He said he would kill him and that "he would grind my glasses into my eyes". He had alcohol on his breath at the time. Respondent testified that his brother was not employed and had no money or property. Over objection, he stated that based on what he observed and what his brother told him, he did not think appellant could take care of himself at the present time because of his drinking. He was aware that appellant had been in and out of jails for drunkenness in Kirksville, West Plains and Owensville.

Dr. Javier Pichardo, Chief of Medical Staff at the state hospital in Farmington, testified that he examined appellant on April 12, 1979. The reason for the examination was that appellant did not want to stay or receive treatment. When taken to the hospital on April 9, appellant was intoxicated. On April 12, when examined, he was completely sober. Dr. Pichardo's testimony was that appellant denied having a drinking problem: "All people had problems but not him.... He denies illness, he denies everything he does when drinking. He has blackouts and he doesn't remember what he does." Dr. Pichardo further testified, without objection, that his diagnosis was that appellant had been an alcoholic with possibly manic–depressive personality for a long time. This last time "I have found also a log of paranoid features in his behavior and what he said.... He has a chronic alcoholic disease".

He was admitted to the state hospital in 1956 and diagnosed as an alcoholic. He was brought in several times after that, once in 1959, and twice each in 1972 and 1973. The night before the trial, appellant was brought in by the police after he was discovered staggering on the highway. On prior admissions, he was brought in because of threatening behavior to his wife or boys, all during drunken episodes.

Dr. Pichardo testified that appellant was in need of treatment. "I don't believe he is competent to say he needs treatment or not. It [alcoholism] interferes with his ability to take care of himself."

Respondent's Exhibit 3, introduced without objection and being part of the records of the state hospital at Farmington, showed that appellant had been admitted there

eight times since June 23, 1956; that he also had been admitted to Malcolm Bliss Mental Health Center in St. Louis in November, 1969, the St. Louis State Hospital in March, 1970, and the Central State Psychiatric Hospital in Nashville, Tennessee, in May, 1971. These admissions were acknowledged by appellant as being alcohol related.

Appellant testified on his own behalf. He stated that prior to coming to live with his mother, he lived in Des Moines, Iowa, for about a year; in Guthrie, Kentucky, prior to that for six months; and before that in Tennessee for five years. He said he worked in a sawmill in Kentucky and at Sunset Cemetery in Des Moines. He worked for his son in the rug business in Tennessee. He admitted that he was jailed for drinking twice in Tennessee, once each in Kirksville and West Plains and in an alcohol unit in Illinois.

Appellant denied making any threats to his mother on April 6 but did admit to drinking wine that day. He acknowledged that he has a drinking problem—"I can't get enough of it sometimes"—and considers himself a "periodic alcoholic". When he drinks wine, he drinks about two quarts a day for eight or nine days in a row. He asserted, however, he experiences no behavioral or memory changes; that he does not have blackouts; and that his mother and brother lied during their testimony. Appellant admitted pushing in the back door to his mother's house and breaking the glass in order to retrieve his clothes. He also admitted threatening his brother: "I told him I'd bust his damn jaw. I didn't say I'd kill him or grind his glasses."

■ We have reviewed the evidence in detail and reach the inescapable conclusion that the evidence fully supports the findings of the trial judge. We are dealing with a finding of incompetence by reason of habitual drunkenness under Chapter 475 and not commitment under Chapter 202. Section 475.010(3) defines an incompetent as "[A]ny person who is incapable by reason of insanity, mental illness, imbecility, idiocy, senility, habitual drunkenness, excessive use of drugs, or other incapacity, of either managing his property or caring for himself, or both; ...."

The evidence apart from any opinions of appellant's mother or brother, clearly demonstrates that appellant's life, at least since 1956, has been marred by numerous periods of drunkenness requiring hospitalization on many occasions and incarceration on others. He classifies himself as a periodic alcoholic. Dr. Pichardo, who saw him on a number of occasions, most recently on April 12, 1979, and who was familiar with his hospital history from the records, diagnosed him as having a "chronic alcoholic disease" and stated he has been an alcoholic with possibly aggressive personality for some time. He also found paranoid features. We believe there is a rational factual basis upon which the lay and expert opinions are based. *Dowling v. Luisetti*, 351 Mo. 514, 173 S.W.2d 381, 385 (1943). In our view, even disregarding the opinions, the evidence supports the finding that appellant is and has for sometime been an habitual drunkard and is incapable by reason thereof of "caring for himself". The mere fact that during periods of sobriety he is able to feed and dress himself does not diminish the threat to himself and others arising from his periods of severe drunken incapacity. This is illustrated, in part, by his wandering on a busy highway after drinking a fifth of wine the night before his trial.

■ But more important, Dr. Pichardo was of the opinion that he needs treatment. Appellant refuses, even when sober, to acknowledge his need for medical treatment. A guardian of his person, acting under court direction and authority might possibly make the necessary decision for him or otherwise seek means of caring for him.

■ As there is no estate to be managed, the trial court properly limited the guardianship to the person of appellant. We believe the evidence fully meets the tests for incompetency set forth *In re Delany*, 226 S.W.2d 366, 373 (Mo.App.1950), and followed in *In Matter of Armstrong*, 573 S.W.2d 141 (Mo.App.1978), in that appellant has been shown by reason of habitual

drunkenness to be "incapable of understanding and acting with discretion in the ordinary affairs of life".

The judgment of the trial court was supported by substantial evidence, it is not against the weight of the evidence and does not erroneously declare or apply the law. Hence, on this review it is to be sustained. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

Since the case was submitted on appeal, respondent has filed a motion to dismiss the appeal as being moot for the reason that it has been discovered that on April 21, 1959 an order was entered by the St. Francois Probate Court adjudging Norman Compton "a person of unsound mind and incapable of managing his affairs" and appointing his then wife Doris Compton as guardian of his person and estate; that said Doris Compton was subsequently divorced from Norman Compton and no successor guardian has been appointed; that no petition for restoration has been filed and that the court file has been marked "closed". A certified copy of the probate court order was attached to the motion. No response has been filed by appellant.

■ We decline the invitation to dismiss the appeal on the ground of mootness. We have not before us any evidence upon which we can accurately pass upon the alleged prior adjudication and the effect of time and circumstances upon its continued validity. We do note, however, that the divorce from appellant of the appointed guardian and failure to appoint a successor, appellant's subsequent travels to Kentucky, Tennessee and Iowa and the closing of the court file, could lead to the conclusion that there has been a "de facto" termination of the guardianship. For a similar fact situation presented in a different legal context, see *State v. Brown,* 227 S.W.2d 646 (Mo. 1950). But upon the pleadings and facts before us we are not in a position to make that decision, and accordingly the motion to dismiss is overruled.

The judgment is affirmed.

GUNN, P. J., and STEPHAN and PUDLOWSKI, JJ., concur.