Timothy J. DORSEY,
Plaintiff/Respondent,

v.

Patrick T. DORSEY, Individually and
Personal Representative of the Estate
of M. Sharon Dorsey (Deceased), and
Megan Zeh, Brian C. Dorsey, Michael
M. Dorsey, and Moira K. Dorsey, De-
fendants/Appellants.

No. ED 83540.

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 15, 2005.

Robert J. Maurer, Clayton, MO, for appellant.

C.J. McEnery, Jr., St. Louis, MO, for respondent.

MARY K. HOFF, Judge.

Patrick Tully Dorsey, who was sued individually and as the personal representative of the estate of M. Sharon Dorsey, deceased; Megan Zeh, who was named Megan Maureen Dorsey in the will and challenged codicil; Brian Christopher Dorsey; Michael McPhee Dorsey; and Moira Kathleen Dorsey (all referred to as Proponents) appeal the trial court's grant of a new trial in this will contest in which Timothy James Dorsey (Contestant) challenges a March 24, 1999 codicil to the Last Will and Testament of M. Sharon Dorsey (Testatrix). We reverse the order for a new trial and remand with directions to enter judgment in favor of Proponents declaring that the March 24, 1999 codicil is a valid part of the Last Will and Testament of M. Sharon Dorsey.

Testatrix died on November 28, 2001, while in her fifties. Her original Last Will and Testament, dated September 19, 1992, provided in the third paragraph, that the remainder of her property be distributed to her six children in equal shares. By a March 24, 1999 codicil, Testatrix, in relevant part, revoked the third paragraph of her original Last Will and Testament that distributed the remainder of her property in equal shares to her six children and substituted the following paragraph instead:

THIRD: I give, bequeath and devise all of the rest, residue and remainder of my property owned by me at the time of my death, real and personal, of whatsoever kind, nature or character and wheresoever situated, in equal shares to my children, PATRICK TULLY DORSEY, MEGAN MAUREEN DORSEY, BRIAN CHRISTOPHER DORSEY, MICHAEL McPHEE DORSEY and MOIRA KATHLEEN DORSEY; the descendants living at the date of my death, of either of the above-named leg-
atees who does not survive me, to take the share of their parent per stirpes. I have intentionally made no provision herein for my son, TIMOTHY JAMES DORSEY, or his descendants for reasons well known to him at this time which he and I have discussed at length.

Contestant, Timothy James Dorsey, filed this action challenging paragraph THIRD of the March 24, 1999 codicil on the ground, among other things, that Testatrix lacked the mental capacity to execute the codicil. Testatrix's mental incapacity to execute the challenged codicil was the only ground submitted to the jury. After the trial court denied the parties' motions for directed verdict at the close of all the evidence, the jury returned a verdict finding the March 24, 1999 codicil was a valid part of Testatrix's Last Will and Testament. The trial court entered judgment in accordance with that verdict. The trial court subsequently granted Contestant's motion for new trial, and this appeal by Proponents followed.

Proponents' first, second, and fourth points on appeal contend the trial court erred in granting Contestant's motion for new trial. In their third point, Proponents argue the trial court erred in denying their motion for directed verdict because the evidence, taken in the light most favorable to the Contestant, was insufficient to cause reasonable minds to differ on the question of Testatrix's testamentary capacity at the time she executed the codicil to her will, and the only conclusion a reasonable mind could reach on the evidence is that Testatrix had testamentary capacity when she executed the challenged codicil. Because we find the third point dispositive, we will address that point first. *See Smith v. Fitzjohn*, 354 Mo. 137, 188 S.W.2d 832 (1945) (addressing the submissibility of testamentary capacity and undue influence before addressing the grant of a new trial);

*Rothwell v. Love,* 241 S.W.2d 893 (Mo. 1951) (addressing the submissibility of testamentary capacity before addressing the grant of a new trial); *see also Gamble v. Bost,* 901 S.W.2d 182 (Mo.App. W.D.1995) (addressing the submissibility issue before addressing the issue challenging the trial court's grant of a new trial in an appeal pursued by a defendant who had originally obtained a jury verdict in his favor in the negligence action).

■■■ When we review the denial of a defendant's or proponent's motion for directed verdict, we must determine whether the plaintiff or contestant has introduced substantial evidence that tends to prove facts essential to the plaintiff's or contestant's claim. *Lasky v. Union Elec. Co.,* 936 S.W.2d 797, 801 (Mo. banc 1997); *Emerson Elec. Co. v. Crawford & Co.,* 963 S.W.2d 268, 272 (Mo.App. E.D.1997). If substantial evidence tending to prove facts essential to the plaintiff's or contestant's claim exists, then the trial court does not commit reversible error by denying the defendant's or proponent's motion for directed verdict. *Bequette v. Buff,* 862 S.W.2d 921, 922 (Mo.App. E.D.1993). " 'Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case.' " *Coonrod v. Archer–Daniels–Midland Co.,* 984 S.W.2d 529, 534 (Mo.App. E.D.1998) (*quoting Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d 872, 880 (Mo.App. W.D.1985)). In a will contest proceeding challenging an instrument on the ground the person executing the instrument lacked mental capacity, a trial court does not err in denying a defendant's or proponent's motion for directed verdict when there is "sufficient substantial evidence ... from which a jury could reasonably have found a lack of general testamentary capacity" at the time the challenged instrument was executed.

*Byars v. Buckley,* 461 S.W.2d 817, 820 (Mo.1970). When reasonable minds could draw different conclusions from the facts about the testatrix's mental incapacity at the time the instrument was executed, then a directed verdict in favor of the defendant or proponent in a will contest is improper because the issue of testamentary capacity becomes a question for the jury. *See Crabtree v. Bugby,* 967 S.W.2d 66, 70 (Mo. banc 1998) (claim of employment discrimination based on the filing of a worker's compensation claim); *Lasky,* 936 S.W.2d at 801 (negligence action); *Lopiccolo v. Semar,* 890 S.W.2d 754, 760 (Mo. App. E.D.1995) (will contest on grounds of undue influence).

■■■ It is reversible error, however, to submit to the jury, over objection, the issue of testamentary capacity if the contestants fail to present substantial evidence of the mental incapacity of the person executing the instrument at the time of its execution. *Maurath v. Sickles,* 586 S.W.2d 723, 728 (Mo.App. E.D.1979). A defendant's or proponent's motion for directed verdict should be granted when "the facts in evidence and the reasonable inferences therefrom [are] 'so strongly against a party that no room is left for reasonable minds to differ.' *Burns [Nat'l Lock Installation Co. v. American Family Mut. Ins. Co.],* 61 S.W.3d [262,] 271 [(Mo. App.E.D.2001)]." *Uxa ex rel. Uxa v. Marconi,* 128 S.W.3d 121, 128 (Mo.App. E.D. 2003); *see also Tharp v. Monsees,* 327 S.W.2d 889, 899 (Mo. banc 1959).

■■■ In our review of the denial of a defendant's or proponent's motion for directed verdict, we consider the evidence in a light most favorable to the plaintiff or contestant, give the plaintiff or contestant the benefit of all reasonable inferences legitimately drawn from the evidence, and disregard the defendant's or proponent's evidence except to the extent it supports

the plaintiff's or contestant's case. *Sturm v. Routh,* 373 S.W.2d 922, 923 (Mo.1964); *Byars,* 461 S.W.2d at 819–20; *Crabtree,* 967 S.W.2d at 70. " '[W]e do not supply missing evidence or give [the] plaintiff [or contestant] the benefit of unreasonable, speculative, or forced inferences.' " *Coonrod,* 984 S.W.2d at 534 (*quoting Klugesherz v. American Honda Motor Co.,* 929 S.W.2d 811, 813 (Mo.App. E.D.1996)). "The issues of whether the evidence is substantial and whether the inferences drawn are reasonable present questions of law." *City of Sullivan v. Truckstop Restaurants, Inc.,* 142 S.W.3d 181, 191 (Mo. App. E.D.2004); *see also Tharp,* 327 S.W.2d at 899.

▮▮▮▮ When a will or codicil is challenged on the grounds the person executing the instrument lacked testamentary capacity, the proponents of the challenged instrument have the burden to establish a prima facie case of due execution of the will or codicil and of the sound mind of the testatrix at the time of the instrument's execution.[1] *Maurath,* 586 S.W.2d at 728. Then, to submit the issue of mental incapacity to the jury, the contestants must introduce substantial evidence that the testatrix did not have the mental capacity to make the instrument at the time it was executed. *Id.; Glover v. Bruce,* 265 S.W.2d 346, 353 (Mo.1954). *See also Dowling v. Luisetti,* 351 Mo. 514, 173 S.W.2d 381, 385 (1943). Importantly, "[t]here can be no submissible issue of testamentary incapacity without some evidence of such incapacity *at the time* the [codicil] was executed." *Smith,* 188 S.W.2d at 833. Evidence of mental unsoundness before or after the execution of the challenged instrument, as long as it is not too remote in time and indicates men-

tal unsoundness existed when the instrument was executed, is admissible. *Id.See also Glover,* 265 S.W.2d at 352. "[L]ay witness [testimony] is competent [evidence] provided it is based upon facts furnishing a reasonable inference of mental unsoundness" at the time the challenged instrument was executed. *Smith,* 188 S.W.2d at 833. Additionally, medical opinion testimony may be introduced to establish the mental unsoundness of a person at the time a challenged instrument is executed. *See Ambruster v. Sutton,* 362 Mo. 740, 244 S.W.2d 65 (1951).

▮▮▮▮ A testatrix is shown to have testamentary capacity when the evidence reveals that, at the time of the execution of the will or codicil, the testatrix understood the ordinary affairs of life, the value and extent of her property, the persons who are the natural objects of her bounty, and that she is giving her property to the persons mentioned in the will or codicil in the manner stated. *Glover,* 265 S.W.2d at 352; *see also Sturm,* 373 S.W.2d at 928. If a testatrix's testamentary capacity is established, then she has " 'the right to dispose of [her] property according to [her] own way of thinking, and it is not for courts or juries to make a will [or codicil] for [her].' " *Rex v. Masonic Home of Missouri,* 341 Mo. 589, 108 S.W.2d 72, 74 (1937) (*quoting Major v. Kidd,* 261 Mo. 607, 170 S.W. 879, 881 (1914)).

▮▮▮▮ In light of these principles, we review the evidence at trial to determine whether there was substantial evidence indicating Testatrix lacked mental capacity to execute the March 24, 1999 codicil. Contestant and his wife, Kelley Dorsey, testified as did Testatrix's deceased husband's sister, Kathleen McKee; Testatrix's

---

**1.** We find the record establishes that Proponents satisfied their initial burden of showing both due execution of the codicil and Testa-

trix's mental capacity at the time the codicil was executed through several witnesses present at its execution.

brother, Michael Tully; and a psychiatrist, Dawn Holeman, who had neither met nor examined Testatrix. Contestant also produced the deposition testimony of one of Contestant's brothers, Patrick Dorsey; a letter written by Kelley[2] and Tim to Patrick, and the letter response sent by Patrick and his wife, Denise Dorsey; two letters written by Testatrix to Kelley and Tim; and the medical records of a psychologist, Dr. Samuel Blumberg, who treated Testatrix from 1995 until 2001. Proponents introduced into evidence the testimony of: Anthony L. Anderson, the attorney who drafted and was present for the execution of the challenged codicil; Lela Von Drasek, Beulah Anderson, and Gerald L. Warren, the three witnesses to the execution of the challenged codicil; Megan Zeh; Patrick; Dr. Samuel Blumberg, the psychologist who treated Testatrix for several years until 2001; Dr. Fred Rottnek, who was Testatrix's physician from 1998 until 2000 and Testatrix's friend from 1996 until her death; Nancy Taschler, one of Testatrix's friends; Brian; and Michael.

Through our review of this evidence and its reasonable inferences in a light most favorable to Contestant, the record reveals that: Testatrix was a registered nurse, who worked until she died in November 2001 as a result of ovarian cancer and there were only a few days between her diagnosis and death. Testatrix sometimes had disagreements with relatives as a result of which she would not speak to them for over a month, and even for approximately one year. Her disagreements with Tim and Kelley will be discussed in more detail below.

Testatrix's brother, Michael Tully, testified that his and Testatrix's mother had psychiatric problems and in 1984 to 1985 was diagnosed as having manic depression, for which she received chemical and electro-shock treatment and was in and out of the hospital from Labor Day 1984 until her death in December 1985.

Testatrix's husband, James Dorsey, died suddenly in 1992 while at the airport accompanied by Testatrix. Tim and Testatrix had disputes about seeing James's body at the hospital and at the funeral home, and Testatrix was angry when Tim let others know James's body could be viewed before the closed casket funeral.

In January 1993 Tim met Kelley, a citizen and at that time a resident of Canada, while on vacation in Jamaica. For about six weeks beginning in October 1993 they lived with Testatrix, until they moved into their own apartment in the St. Louis area. Kelley and Testatrix enjoyed a cordial relationship during this time. When Tim and Kelley discussed getting married in Jamaica with Testatrix, she got angry, saying in part, "You can't do that. That would be like giving the entire family the finger." In an effort to get married before Kelley's four-month visitor's visa expired, Tim and Kelley were married in January 1994 by a judge in St. Louis. Tim and Kelley sent an informal wedding invitation to the "Dorsey Family" but no one attended the ceremony other than Michael Tully, his wife, Nancy Tully, two of Tim's friends, and the parents of one of those friends.

Within a few months of the January 1994 wedding, Kelley told Tim that Testatrix had told her something like James's death "was the best thing that could have happened. That she was planning on divorcing [him] but she was going to wait until [their youngest child] graduated from high school." In the spring or summer of

2. For ease of reference we may use first names when we refer to individual members of the Dorsey family who have the same last name. We do not mean to be disrespectful by using an individual's first name only.

1994 Tim confronted Testatrix in an effort to get her to talk about her reported plans to divorce James. During this conversation, Kelley said to Testatrix, "You might have wanted your husband dead, but you're not going to kill mine" and called Tim's sister, Megan, a profane name. Although Testatrix never told Tim not to come to her home, Tim did not see Testatrix again except at his grandmother's funeral in 1997 and in the four days before Testatrix died. Kelley apologized to Megan for that 1994 comment shortly before Testatrix died. Tim was not invited to Megan's and Brian's weddings, which were in 1999 and 2000, respectively.

After Testatrix's death, Patrick discovered two undated letters Testatrix had written, one to Kelley and one to Tim, discussing her reaction to the wedding plans they had discussed. In the letter addressed to Tim, Testatrix stated in part:

There are not enough adjectives available to describe my feelings after our conversation Sunday. You are filled with such hate and bitterness, it is frightening.

* * *

If you chose to designate me as the lightning rod for all your problems so be it. I have attempted to provide a home and family for you and your siblings. With a large group of people there are always a variety of personalities and emotions along with those emotions [sic?] are what "being a family" is about. I've always opened our home to your friends.

I hope in time you can resolve your hatred and bitterness. Historically, looking back, you might be able to see that you were always given support and love and did not want for anything.

* * *

Hopefully, our family will withstand the turmoil. I also hope you will be comfortable and happy with the decision regarding the accusations.

My best wishes to you and Kelley and much happiness.

Love, Mom

The one addressed to Kelley stated in part:

To say I am perplexed at the present state of affairs is an understatement....

* * *

Sadly, I ... have never seen so much hate and venom directed at me.

The phrase lying and talking behind people is often repented. As indicated by my prior statements what seemed to be the problem are my truthful comments. If I had lied, I suppose everyone would be happy.

* * *

Perhaps if Tim had been honest and upfront with me at the onset and through the last few months, some of this could be avoided—but then maybe not.

Life is too short. Who knows who will ever be here tomorrow. My family is important to me. If one member chooses to depart, that saddens me. If one apple falls off the tree, I hope the other apples and tree remain strong and intact.

My best wishes to you and Tim and much happiness. Since the unfamiliar phrase "giving my blessing" has become such an issue—you have that, too. Go for it.

* * *

[/s/] Sharon

Michael Tully, Testatrix's brother, testified that, while Testatrix may have had trouble knowing who in her family liked her or who her friends were, he and Testatrix handled a number of legal matters together; he never doubted her ability to handle major life decisions about her family and property; and she was "well oriented and alert to what was going on" when they discussed "any kind of family business . . . from time-to-time."

Dr. Holeman, a psychiatrist who did not meet or treat Testatrix, but who reviewed Dr. Blumberg's records of his care of Testatrix and spoke with Contestant and Tully, also testified for Contestant. Tully told Dr. Holeman his and Testatrix's mother had been diagnosed with manic depression. From reviewing Dr. Blumberg's records, Dr. Holeman discerned that Dr. Blumberg diagnosed Testatrix with "depressive disorder . . . NOS, which refers to not otherwise specified," which "encompasses a lot of symptoms [and] doesn't necessarily get better"; that Testatrix was treated with antidepressant medications from 1996 until 2001; and that "there were episodes that were suggestive of hypomania, which were in the notes followed by a significant depression." She testified that, in her "thinking," Testatrix had "a hypo-manic episode" in the spring of 1999 based on Dr. Blumberg's notes indicating Testatrix had "a broad and expansive affect" during visits on March 17, 1999, and April 7, 1999, and had what Dr. Holeman characterized as "impulsive and rash actions" in June and July 1999. As a result of her review of Dr. Blumberg's records, and conversations with Tim and Tully, Dr. Holeman diagnosed Testatrix as having "depression, with hypo-manic episodes interspersed." Then, in response to a hypothetical, Dr. Holeman opined that Testatrix was not of sound mind on March 24, 1999. Dr. Holeman did testify that she wouldn't know from the records whether Testatrix knew

the natural objects of her bounty, and, as far as she could tell, Testatrix had sound enough mind to be a professional nurse, go to work everyday, and "handle any number of other types of decisions that would occur in the normal everyday life."

Dr. Blumberg's records for his January 18, 1999, February 24, 1999, and March 17, 1999 visits with Testatrix report that Testatrix was going to Italy in March. Then, Dr. Blumberg's progress notes for his April 7, 1999 visit with Testatrix indicates her report that "Italy [was] good."

Proponents' evidence does not support Contestant's claim except to the extent it reiterates evidence Contestant presented showing Testatrix had some disputes with people and that Dr. Blumberg treated Testatrix for a diagnosed depression for several years before her death. Because we may not consider evidence contrary to that supporting Contestant's claim, we will not discuss Proponents' evidence in detail. We note, however, that their evidence substantially supports a determination that Testatrix was of sound mind within the period of time encompassing March 1999. Such evidence includes the testimony of: Anderson, the attorney who drafted and was present at the execution of Testatrix's will and challenged codicil, who testified Testatrix was of "sound mind" at the time she executed the challenged codicil; Warren, one of the witnesses to the execution of the challenged codicil, who testified nothing happened at the execution of the codicil that gave him "any reason to question whether she was of a sound and disposing mind at the time"; Dr. Blumberg, the psychologist who treated Testatrix from about 1995 through 2001, who testified she was not of unsound mind and was a "balanced" person; Dr. Fred Rottnek, who was Testatrix's friend from 1996 until her death, and her physician from 1998 until 2000, who testified she was "never" of

unsound mind; Patricia Zach, who was a friend of Testatrix from about 1997 until her death and testified she would "rate [Testatrix] as being of a very sound mind, very straightforward"; Patrick, who testified Testatrix had normal mood swings and was not delusional until the last few days of her life when she was on medication; Brian, who lived with Testatrix at least from 1994 until his marriage in 2000, and testified Testatrix functioned as the head of the household during that time; Michael, who has lived in Testatrix's home all of his life and testified that Testatrix was capable of managing her own affairs; and Megan, who testified Testatrix had numerous friends, was not subject to unusual mood swings, and was not delusional until the last few days of her life when she was on medication.

Based on this record, and our standard of review, we conclude Contestant did not introduce substantial evidence of Testatrix's lack of testamentary capacity on March 24, 1999. All of the lay witness testimony regarding Testatrix's behavior and demeanor that was presented by Contestant either pointed out Testatrix was a registered nurse who continued to work until shortly before her death and could handle business and family affairs, or addressed conduct that occurred five or more years before Testatrix executed the challenged codicil. None of the lay witnesses presented by Contestant expressed an opinion that Testatrix was of unsound mind at any point of time near March 24, 1999. Moreover, neither Contestant nor his wife, Kelley, saw Testatrix for over seven years, between the spring of 1994 and a few days before Testatrix's death in November 2001, except briefly at a funeral in 1997. The fact that Contestant and Kelley had disagreements with Testatrix in late 1993 and early 1994 regarding their wedding ceremony does not indicate to us that Testatrix was of unsound mind in

March 1999. Nor does the fact Testatrix may have chosen not to initiate further encounters with Contestant and Kelley after the heated exchange between Kelley, Testatrix, and Zeh in the spring of 1994 persuade us that Testatrix was of unsound mind in March 1999. While the lack of communication and interaction between Testatrix and her son and his wife for such a long period of time may be tragic and unfortunate, that lack of closeness does not in itself depict Testatrix was of unsound mind when executing a codicil that cut off that son's share of Testatrix's bounty upon her death. Rather, the prolonged lack of communication and interaction may indicate the reason for the change in the distribution of Testatrix's property to her children.

Contestants did not present any evidence that at the time Testatrix executed the March 24, 1999 codicil she was unable to transact her ordinary business and household affairs, did not know or understand fully the value and extent of her property, did not know who were the objects of her bounty, and did not understand she was giving her property as set forth in the codicil.

While Contestant did present the opinion of a psychiatrist that Testatrix was of unsound mind on March 24, 1999, that opinion, based only on a hypothetical and not on a meeting with or treatment of Testatrix, is not substantial evidence of Testatrix's testamentary incapacity at the time she executed the challenged codicil. Several Missouri Supreme Court cases support our determination that this type of medical opinion testimony is insufficient to submit the issue of Testatrix's testamentary capacity to the jury. *Rex*, 341 Mo. 589, 108 S.W.2d 72; *Dowling*, 351 Mo. 514, 173 S.W.2d 381; *Rothwell*, 241 S.W.2d 893.

In *Rex*, the Missouri Supreme Court found the contestants had not presented substantial evidence of a testatrix's lack of testamentary capacity despite lay witness opinions that the testatrix was of unsound mind, a treating physician who "had no opinion as to" the testatrix's "mental condition," and the opinion of two non-treating physicians, based on a hypothetical, that she was of unsound mind at the time the challenged will was executed. *Rex*, 108 S.W.2d at 80–85. The Court characterized the lay witness testimony as showing Testatrix had "personal eccentricities and peculiarities, ... [and may have been] stubborn, suspicious, ... lacking in affection for her relatives, stingy, and ... exhibiting a quick and explosive temper" on occasion, but concluded that testimony was not probative of testamentary incapacity because it was not accompanied by proof of the testatrix's conduct at the time she executed the challenged will. *Id.* at 85. Moreover, the two opinions by non-treating physicians "based wholly and alone upon the facts and circumstances detailed in contestants' evidence d[id] not constitute substantial evidence of testamentary incapacity." *Id.*

In *Dowling*, the Missouri Supreme Court again found opinions of physicians who had not seen the testator and who based their opinions on hypotheticals did "not constitute substantial evidence of mental incapacity" in light of the absence of evidence of the testator's mental incapacity on the date the challenged will was executed. *Dowling*, 173 S.W.2d at 386. The testator executed the challenged will at a hospital the day after he was admitted to the hospital and within 19 days of his death. *Id.* at 381–82. Hospital records admitted into evidence reported that at the time of his admission to the first hospital the testator was "unable to give [a] lucid picture of his present illness [and was] an uncooperative senile white man of 80 in no

acute distress," and, upon his transfer to another hospital the day after he executed the will, he was diagnosed as, in part, suffering from "[s]enility," and was admitted "conscious and rational." *Id.* at 384. The Court noted "the contestants' case rests entirely upon the testimony of expert witnesses who never saw [the testator].... [The] contestants produced no witness, either lay or professional, who ever saw him either after he went to the hospital or even when he was confined to his room prior" to that. *Id.* at 385. The only lay witness presented by the contestants who spoke to the testator approximately two months prior to his hospitalization "did not question his mental capacity at that time." *Id.* The Court also found that the notation upon the testator's initial hospital admission that he was unable to give a "lucid picture" was unclear absent testimony "as to what kind of a statement [the testator] made, what his conduct was, or how he then appeared" and "it [was] impossible to tell what it meant without some further explanation." *Id.* at 386. The other hospital record indicating that, upon admission, the testator was "conscious and rational" was found by the Court to be "clear and need[ed] no explanation." *Id.*

In *Rothwell*, the Missouri Supreme Court determined that the testimony of a medical expert, based only on a hypothetical and his review of hospital records, that the testator was "suffering from senile psychosis and therefore of unsound mind," along with certain lay witness testimony which did not reveal conduct by the testator "that would justify or support these witnesses' stating the testator was of unsound mind," did "not add up to substantial evidence that [the testator] did not have mental capacity to make" the challenged will. *Rothwell*, 241 S.W.2d at 894, 895. Concluding the record did "not con-

tain substantial evidence that [the] testator was of unsound mind at the time he signed the [challenged] will," the Supreme Court held the proponents' contention that the contestants "did not introduce substantial evidence authorizing the submission of the case to the jury should be sustained." *Id.* at 896.

As in those cases, the lay witness testimony Contestant presented here does not reveal any evidence of people who observed or spoke with Testatrix on or around March 24, 1999 the date she executed the challenged codicil. Therefore, there is no lay witness evidence of Testatrix's testamentary incapacity on that date. Contestant's case must depend only on the opinion provided by Dr. Holeman that Testatrix was of unsound mind on March 24, 1999. That opinion, however, was not derived from Dr. Holeman's visit with or treatment of Testatrix, but was derived solely from a review of medical records, a conversation with Tim, a conversation with Tully regarding the mental health of his and Testatrix's mother, and a hypothetical posed during trial. Under the circumstances, Dr. Holeman's opinion does not constitute substantial evidence of Testatrix's mental incapacity on March 24, 1999. Because Contestant failed to present substantial evidence from which reasonable minds could draw different conclusions from the facts about Testatrix's mental incapacity on March 24, 1999 the issue of her testamentary capacity was not a question for the jury and the trial court erred in not granting Proponents' motion for directed verdict.

Point three is granted. In light of our disposition of point three, we need not address points one, two, and four.

The order for a new trial is reversed and this matter is remanded with directions to enter judgment in favor of Proponents declaring that the March 24, 1999 codicil is a valid part of the Last Will and Testament of M. Sharon Dorsey.[3]

LAWRENCE E. MOONEY, Presiding Judge and LAWRENCE G. CRAHAN, Judge: Concur.

---

**3.** Contestant's motion to strike Proponents' original brief for failure to comply with Rule 84, filed April 16, 2004, is denied as moot because we granted Proponents leave to file an amended brief. Contestant's motion to strike Proponents' amended brief for failure to comply with Rule 84 is denied.